658 A.2d 746

COMMONWEALTH of Pennsylvania, Appellee,

v.

Walter Russell JONES, Appellant.

Supreme Court of Pennsylvania.

Argued March 7, 1995.

Decided May 12, 1995.

Reargument Denied July 12, 1995.

444

Gene P. Placidi, Erie, for appellant.

William R. Cunningham, Dist. Atty., William A. Dopierala, Bradley H. Foulk, Asst. Dist. Attys., for appellee.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

FLAHERTY, Justice.

This is an appeal by allowance from a memorandum decision of the Superior Court which affirmed a judgment of sentence imposed by the Court of Common Pleas of Erie County. 427 Pa.Super. 643, 625 A.2d 90. In 1991, the appellant, Walter Russell Jones, was convicted of murder of the first degree, possession of an instrument of crime, and carrying a firearm without a license. A sentence of life imprisonment was imposed for the murder conviction, with a consecutive sentence of five to ten years for the other offenses.

The convictions arose from the murder, on August 28, 1988, of Humberto "Puggy" Sama, Jr. Sama was found dead outside a banquet hall in Erie. He had been shot once in the head and once in the neck.

Appellant's conviction rested on evidence that he picked up Sama in his car just prior to the shooting, that he was owed money by Sama, that he previously threatened Sama, that he had asked a friend for advice on how to commit murder, that he possessed a gun of the type used in the shooting, that an hour before Sama's body was discovered he disposed of that

gun, and that on several occasions he admitted to various friends and acquaintances that he killed Sama.

The first issue is whether the trial court erred in allowing testimony from a prosecution witness regarding allegedly tainted cocaine given her by appellant.

The witness, Diane Stepp Worrell, testified that she was a prostitute and that, after Sama was murdered, she went to an apartment in May of 1990 to engage in sexual relations with appellant. While there, she asked appellant whether he knew who killed Sama. Appellant became upset, discontinued the sexual encounter, and stated that he killed Sama and that he would do the same to anyone else who tried to hurt him or "rip him off." Before leaving the apartment he gave Worrell, as payment for her services, a quantity of cocaine.

Worrell testified that, at the time of this encounter with appellant, she had been a user of cocaine for approximately seven years. She was familiar with certain methods for determining whether cocaine was of good quality. Before using the cocaine provided by appellant, she tasted it and found that it had a strange taste unlike that of any cocaine she had ever used, causing her to conclude that "It was bad. It wasn't cocaine." After noticing the suspicious taste, she cooked the cocaine with a mixture of baking soda and water, a procedure intended to turn the cocaine into a hard substance. While cooking it, she noticed a reaction unlike any cocaine she had ever seen, namely, it "fizzed like an Alka–Seltzer" and emitted a very strong and bad odor, a medicinal smell that was "totally different" from cocaine. She stated that she never used this cocaine because she believed it was not real cocaine, or was tainted, and that it would cause her harm. She also testified that she encountered appellant a couple of days later and that, upon seeing her, he "look[ed] dead at me like he seen a ghost."

The court, in allowing admission of the testimony regarding tainted cocaine, reasoned that appellant's action in giving the substance to Worrell after confessing to her his guilt in the Sama murder, and his reaction upon seeing her a couple of

days later, provided a logical and relevant implication that he attempted to dispose of her as a potential witness. We do not agree. Admission of the testimony constituted an abuse of discretion. See *Commonwealth v. Claypool,* 508 Pa. 198, 203–04, 495 A.2d 176, 178 (1985) (appellate review of whether the trial court abused its discretion as to the admissibility of evidence).

Evidence of a defendant's attempt to dispose of a witness may be relevant and admissible to establish consciousness of guilt. See *Commonwealth v. Markle,* 239 Pa.Super. 505, 515, 361 A.2d 826, 831 (1976) ("[E]vidence that appellant had threatened to kill the Commonwealth's chief witness could be admitted to show appellant's consciousness of guilt.") See also *Commonwealth v. Robson,* 461 Pa. 615, 628, 337 A.2d 573, 579 (1975) (attempting to destroy or dispose of evidence may reveal consciousness of guilt), cert. denied, 423 U.S. 934, 96 S.Ct. 290, 46 L.Ed.2d 265 (1975). The facts of this case fall short, however, of establishing that appellant attempted to harm or kill Worrell. No scientific analysis of the cocaine was ever performed. The opinion given by Worrell that the cocaine would have harmed her was highly speculative in nature, inasmuch as Worrell had no expertise in scientific analysis and relied merely on her lay impressions as a cocaine user. Similarly, her perception that appellant looked at her like a "ghost" could be subject to many interpretations. It is purely speculative, too, that appellant knew that the cocaine was defective. Thus, whether appellant intended to harm Worrell is a matter of mere conjecture and not proper for admission as evidence of an actual attempt to eliminate Worrell as a witness.

Nevertheless, in view of overwhelming evidence of appellant's guilt, the error in allowing testimony about the tainted cocaine was harmless. See *Commonwealth v. Story,* 476 Pa. 391, 412, 383 A.2d 155, 166 (1978) ("[A]n error may be harmless where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reason-

able doubt that the error could not have contributed to the verdict."). The evidence against appellant included the following.

Worrell testified that approximately two months before Sama's murder she overheard an argument in which appellant told Sama, "I'm tired of your s——. I'm going to kill your f------ a--." Further, she testified that Sama was in debt to appellant for drugs, and that, after 1:30 a.m. on the night of the murder, approximately six hours before Sama's body was discovered, she saw Sama enter a car that was being driven by appellant. This was in addition to the testimony, heretofore described, that during her prostitution session with appellant, appellant became upset at the mention of Sama and unequivocally stated that he killed Sama and that he would do the same to anyone else who tried to hurt him or "rip him off."

Sama's mother testified that approximately five weeks before the murder, a man she believed to be appellant came to her home one night angrily inquiring whether Sama was there, and saying, "He owes me some money, and if I don't get my money, he knows what will happen."

One of appellant's close friends, Al Tyczkowski, testified that appellant regarded him as a role model and mentor. Appellant admired Tyczkowski's extensive criminal record. Around March of 1988, appellant asked for assistance in obtaining a gun. Tyczkowski declined the request. On several occasions thereafter, appellant told Tyczkowski that he "was having a problem with somebody" and asked, "What would be the best way to get rid of somebody?" In May, appellant showed Tyczkowski a .38 caliber revolver that he said had been purchased by his father at a certain gun store. Discussions of murder ensued, extending into July, and Tyczkowski advised that murder should be committed in an isolated location on a rainy night, so that physical evidence such as tire tracks and footprints would be washed away. Tyczkowski also recommended that murder not be committed in Millcreek Township.

Tyczkowski testified that Sama had been in debt to appellant over many months for a sum of fifty dollars, and that appellant repeatedly mentioned the debt and was angry that it had not been paid. Tyczkowski described appellant as having a quick temper.

At 7:10 a.m. on August 28, 1988, after a rainy night, appellant arrived unexpectedly at Tyczkowski's house. Appearing tense, anxious, and nervous, he said, "Where can I get rid of this gun?" Tyczkowski replied, "How hot is it?" Appellant showed him the gun and said, "Remember Puggy [Sama]? Remember Puggy, Puggy is history . . . Puggy ain't no more." Tyczkowski observed that the gun appeared to be the same one appellant had shown him in May. Tyczkowski disassembled the gun, and noticed that two of its five cartridges were spent.

While Tyczkowski was dismantling the gun, appellant told him that Sama "became history" near a certain restaurant, a banquet hall in Erie. Appellant said that he drove Sama to a parking lot at the restaurant and demanded his fifty dollars. Sama replied that he didn't have the money. Appellant insisted, "I want my f------ money." He ordered Sama to get out of the car and then shot him twice in or about the head. After relating this information to Tyczkowski, appellant left Tyczkowski's house and took with him all of the pieces of the gun.[1] Tyczkowski had told appellant to throw the pieces into a lake. Four or five weeks later, appellant took Tyczkowski to view the crime scene.

Anita Beason testified that she was appellant's girlfriend in the spring of 1989, and that on April 2, 1989 appellant told her that he had killed Sama. She asked why he did it. He replied that Sama "beat him," which she understood to mean not a physical beating but rather something related to a drug transaction. After reiterating that Sama "was history" and stating, "sometimes a man have to do what a man have to do," appellant declined to discuss the matter further.

1. The fact that appellant visited Tyczkowski on the morning in question was corroborated by testimony from another occupant of the rooming house where Tyczkowski resided.

Beason also testified that, just before trial commenced, appellant called her from prison and asked her to perjure herself by denying that he had admitted committing the murder. Phone company records confirmed that a call originating in appellant's prison cell block was made to Beason's telephone on the day in question.

The manager of the store that sold appellant's father a gun in May of 1988 testified that the gun was a .38 caliber revolver, and that the sale included a box of .38 caliber Smith and Wesson ammunition. A ballistics expert testified that the bullets removed from Sama's body were .38 caliber Smith and Wessons that could well have been fired from that gun. Appellant's father testified that appellant accompanied him when he purchased the gun, and that, shortly after he took the gun home and put it in a dresser drawer, the gun disappeared and was never seen again. Appellant had access to the room where the gun was kept.

The evidence of appellant's guilt was clearly overwhelming. Particularly in view of appellant's confessions to Worrell, Tyczkowski, and Beason, it is inconceivable that the jury's finding of guilt was affected by Worrell's opinion that she had been supplied with tainted cocaine.

Further, evidence of appellant's involvement in the drug business permeated the trial, thus making Worrell's reference to appellant's possession of cocaine a matter of no consequence. For example, during cross-examination of Tyczkowski, defense counsel intentionally elicited the fact that, in 1989, appellant became a cocaine dealer. Beason's testimony likewise mentioned appellant's involvement with drugs, and, on cross-examination, defense counsel deliberately elicited the fact that drugs had been found in appellant's house. The error in admitting evidence of the tainted cocaine was plainly harmless.

The next issue is whether the trial court erred in allowing a police officer, Lieutenant Figaski, to testify regarding statements that Tyczkowski made to the police. Appellant

contends that the statements should have been excluded as hearsay. We do not agree.

Tyczkowski's statements to police consisted of information about the crime that corresponded very well with information provided in his own testimony. These included, inter alia, statements that appellant: 1) said his gun had been purchased at a certain gun shop; 2) considered Tyczkowski a mentor and asked for advice on how to commit murder; 3) was told to commit murder on a rainy night in an isolated location, not to leave physical evidence such as tire tracks, and not to commit the crime in Millcreek Township; and, 4) came to Tyczkowski's house with a .38 caliber gun with two spent cartridges in it.

The trial court was within its discretion to allow the testimony. The court summarized the basis for admission of the testimony as follows:

The material objected to was related by the lieutenant in the course of his providing the jury with the rationale of the investigation—in other words, why the investigation went in certain directions and not others and was, therefore, offered and accepted not for the truth of the matters asserted. As such, it was not hearsay evidence and was properly admissible.

Here it must be noted that the entire thrust of the defense was to raise a reasonable doubt in the mind of the jury that the defendant may not have committed the homicide because another individual had been the major suspect and, the defense argued, that other individual may have been the slayer. That suspect died prior to Mr. Tyczkowski's coming forward and advising the police of the defendant's admissions to him. Throughout the trial, the defense attacked the manner and thoroughness of the police investigation in its attempt to have the jury doubt the defendant's involvement by accepting the probability that the other suspect could have been the slayer.

The overview, then, of Lieutenant Figaski provided the jury with a complete picture of the investigation so that the

jury would be able to understand why the police felt the other individual was not, in fact, the slayer.

 It is well established that certain out-of-court statements offered to explain the course of police conduct are admissible on the basis that they are offered not for the truth of the matters asserted but rather to show the information upon which police acted. *Commonwealth v. Yates*, 531 Pa. 373, 375–76, 613 A.2d 542, 543 (1992); *Commonwealth v. Palsa*, 521 Pa. 113, 117, 555 A.2d 808, 810 (1989); *Commonwealth v. Cruz*, 489 Pa. 559, 564–65, 414 A.2d 1032, 1035 (1980). The trial court, in exercising discretion over the admission of such statements, must balance the prosecution's need for the statements against any prejudice arising therefrom. See *Yates*, 531 Pa. at 377, 613 A.2d at 543–44; *Palsa*, 521 Pa. at 118–20, 555 A.2d at 811.

 The testimony of Lieutenant Figaski provided the jury with a complete picture of the police investigation. The lieutenant provided a comprehensive review of all the rumors and leads that police pursued, and chronologically related the progress of the investigation to information received from various individuals, including Tyczkowski. Defense counsel's opening statement had attacked the adequacy of the investigation, alleging that the police ignored facts and evidence and failed to adequately interview potential witnesses. In view of this challenge to the competency of the investigation, it was necessary for the prosecution to provide extensive testimony explaining the course of the investigation.

Further, Tyczkowski's testimony was presented prior to that of Lieutenant Figaski. The lieutenant's testimony about Tyczkowski's statements merely repeated matters covered in Tyczkowski's own testimony. Hence, this is not a case where statements made by a third party who did not testify were introduced indirectly through the testimony of police. Compare *Yates*, supra (police testimony improperly recounted incriminating statements of an informant who did not testify); *Palsa*, supra, 521 Pa. 113, 555 A.2d 808 (police testimony

improperly recited incriminating statements of a declarant who did not testify).

In cases where the third party declarant did not testify, the concern is that by allowing police to testify regarding the declarant's statements, the statements might be taken by the jury as substantive evidence of guilt without there having been an opportunity to cross-examine the declarant. *Yates,* 531 Pa. at 376, 613 A.2d at 543; *Palsa,* 521 Pa. at 118–20, 555 A.2d at 810–11. But such a concern is not present, where, as in this case, the declarant did in fact testify and the subsequent police testimony merely related matters that were covered in the declarant's own testimony.

In short, the trial court did not abuse its discretion in allowing the testimony of Lieutenant Figaski.[2] Although it did err in allowing Worrell to testify about tainted cocaine, the overwhelming evidence of appellant's guilt rendered the error harmless. Hence, the judgment of sentence must be affirmed.

Judgment of sentence affirmed.

MONTEMURO, J., is sitting by designation.

---

**2.** Appellant's brief specifically challenges admission of the lieutenant's testimony, but only insofar as the statements of Tyczkowski are concerned. The brief contains, however, a cursory comment that the lieutenant also should not have testified to statements made to police by "other people." Yet, appellant does not specify the other people to whom he refers. The record does not provide focus to this issue, since objections by the defense were lacking. Appellant asserts that when it became apparent that the trial court, despite objections by the defense, was going to allow the lieutenant to recount the statements of Tyczkowski, it was deemed pointless to make any further objections to this type of testimony.

Notwithstanding the lack of focus in appellant's argument, we have reviewed the lieutenant's testimony and found nothing that constitutes hearsay warranting a new trial. The record reveals, for example, that the lieutenant testified that Anita Beason told police that appellant was responsible for the murder. Beason had already testified at trial, however, that appellant admitted committing the crime. The lieutenant's testimony pertained to the course of the investigation, and appellant was not prejudiced since there had been an opportunity to cross-examine Beason.