684 A.2d 153

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Choi Chun LAM, Appellant.**

Superior Court of Pennsylvania.

Argued March 28, 1996.

Filed Oct. 15, 1996.

498

500

502

504

Leonard Sosnov, Philadelphia, for appellant.

John a. Kenneff, Assistant District Attorney, Millerville, for Commonwealth, appellee.

Before CAVANAUGH, TAMILIA and MONTEMURO,* JJ.

MONTEMURO, Judge:

This appeal arises from the judgment of sentence entered against appellant Choi Chun Lam in the Court of Common Pleas of Lancaster County for first degree murder. Appellant was tried with two co-defendants, Zu Long Xie and Bick Yung Cheng, for the murder of Rong Rong Xu. Following her conviction by a jury, Appellant was sentenced to life imprisonment. We affirm.

On May 3, 1992, two gunmen entered a restaurant owned by Wing Cheng in Quarryville, Pennsylvania, and killed Xu, his wife. In August of 1993, Cho Yee Yeung, a member of a New York crime gang known as the Fuk Ching, was charged by federal authorities in New York with various crimes unrelated to the Quarryville murder. Pursuant to a plea agreement, Yeung revealed his involvement in the killing of Xu, admitting that he and Tang Xue Dan were hired by Appellant, the former wife of Wing Cheng, to commit the murder.

* Retired Justice assigned to Superior Court.

The relationship between the principals arose in early 1992 when Yeung worked as a delivery person in New York City and often made deliveries to a company owned by Chin Cheng, the son of co-defendant Bick Yung Cheng, a friend of Appellant's. Co-defendant Xie was an employee of the company, and after becoming friends with Yeung told him that Appellant was looking for a person to commit a murder. Yeung contacted Dan, who insisted that Yeung participate in the murder. The agreement reached after several meetings between Yeung, Appellant and Bick Yung Cheng was that Yeung would be paid $15,000 at the time of the murder, and another $15,000 later.

The FBI corroborated Yeung's story by having him contact Xie concerning payment of the money still owed for the murder. In April of 1994, federal undercover agents posing as members of the Fuk Ching went to the restaurant owned by Appellant in Montgomery County, Pennsylvania, and in an electronically recorded conversation, reminded her of the money promised to Yeung for the murder. That same day, telephone calls were placed from Appellant's restaurant to her co-conspirators. The next day, Xie contacted the federal agents, and during a taped conversation, agreed to pay the balance, which he did, in fact, eventually deliver.

In accordance with his plea agreement, Yeung testified for the Commonwealth. Xie and Appellant were convicted, while Bick Yung Cheng's case resulted in a hung jury. Appellant raises the following issues on appeal:

1. Were there not repeated instances of impermissible, prejudicial bolstering of the credibility of a critical Commonwealth witness in violation of Appellant's due process rights, and was not counsel ineffective for failing to object?

2. Was it not a violation of Appellant's confrontation rights and the rules against hearsay when statements of a non-testifying co-defendant were introduced even though the statements were not made in the course of or in furtherance of the alleged conspiracy?

3. Is it not clear that Appellant's statements, and the fruit of those statements, should have been suppressed because they were involuntarily made in violation of the due process clause, having been obtained by undercover police posing as violent gang members and acting in a threatening manner?

 a. Was not suppression mandated because the statements were electronically monitored and tape recorded in violation of the Wiretapping Act, 18 Pa.C.S.A. § 5701, *et seq.*, without the requisite approval of the county prosecutor?

4. Was it not error to introduce extensive inadmissible, prejudicial out-of-court conversations between undercover agents and the husband of the deceased which had no proper purpose, and was not counsel ineffective for failing to fully protect Appellant's rights?

5. Did not the prosecutor prejudicially and improperly comment on the good character testimony presented by Appellant, and was not counsel ineffective in failing to object?

Appellant's first contention is that her trial counsel was ineffective for not objecting to alleged improper bolstering of Yeung's credibility.

 Proof of counsel's ineffectiveness requires a demonstration that the underlying claim is of arguable merit, that counsel's act or omission had no reasonable basis directed at effectuating the client's interest, and that counsel's action or omission resulted in actual prejudice. *Commonwealth v. Stanley,* 534 Pa. 297, 299, 632 A.2d 871, 872 (1993). Counsel cannot be held ineffective for failing to raise a meritless claim. *Commonwealth v. Blount,* 538 Pa. 156, 163, 647 A.2d 199, 203 (1994). If an arguable claim of ineffectiveness has been made, and an evidentiary hearing has not been held, we will remand for such a hearing. *Commonwealth v. Kauffman,* 405 Pa.Super. 229, 235, 592 A.2d 91, 94 (1991), *allocatur denied,* 529 Pa. 617, 600 A.2d 534 (1991).

 Improper bolstering of a witness occurs when the Commonwealth places the prestige of the government behind

the witness through personal assurances of his or her veracity, or the Commonwealth indicates that information which is not before the jury supports the witness' testimony. *Commonwealth v. Hartey,* 424 Pa.Super. 29, 35, 621 A.2d 1023, 1026 (1993) (citing *Commonwealth v. Reed,* 300 Pa.Super. 224, 230, 446 A.2d 311, 314 (1982)), *allocatur denied,* 540 Pa. 611, 656 A.2d 117 (1994).

■ Appellant's first allegation of improper bolstering is essentially two-fold: it involves both the testimony elicited by the Commonwealth on direct examination of Yeung regarding his plea agreement, and the court's reading of Yeung's plea agreement to the jury. Appellant contends that Yeung's testimony concerning his obligation to "tell the truth," and the introduction of the plea agreement, signed by the defense and by government officials, was error because its effect was to vouch for Yeung's veracity.

The language of the plea agreement required that Yeung "truthfully disclose" information, "cooperate fully" with various law enforcement agencies, "testify truthfully" concerning anything that is requested of him, and that he give "complete, truthful and accurate information and testimony...." Any "false, incomplete or misleading testimony or information," supplied by him would void the plea. The agreement also provided that Yeung would receive protection if his "truthful" cooperation led to threats against him.

The admissibility of evidence is a matter committed to the discretion of the trial court, which will not be disturbed absent an abuse of discretion. *Commonwealth v. Wharton,* 530 Pa. 127, 146, 607 A.2d 710, 719 (1992).

Appellant cites *Commonwealth v. Bricker,* 525 Pa. 362, 581 A.2d 147 (1990), in support of her argument that the testimony and the agreement provisions were inadmissible. In *Bricker,* the court held that the Commonwealth improperly bolstered the credibility of two witnesses by sending out with the jury, for purposes of deliberation, the plea agreements pursuant to which the witnesses testified. *Id.* at 380, 581 A.2d at 156. Notably, the agreements arose from their arrest on the same

charges for which the defendant was being tried. *Id.* at 378–79, 581 A.2d at 155. The plea agreements reiterated many times the requirement that the witnesses provide "complete and truthful information," and provided that if complete information was not forthcoming, or a false statement was knowingly made under oath in connection with the agreement, the witnesses would be subject to prosecution for perjury. *Id.* The documents were signed by the defense and by federal and state prosecutors. *Id.*

The focus of the *Bricker* decision was the fact that the jury was actually permitted to review the plea agreement during deliberations. Relying upon *Commonwealth v. Tann*, 500 Pa. 593, 459 A.2d 322 (1983), the *Bricker* Court found that by allowing the jury to review the agreements in this way, the agreements served as "silent witnesses" because the jury is able to "read these unredacted documents at their leisure during deliberations" and, "[w]ith the agreements before them, the jurors could reasonably infer that appellant had the same opportunity as [the Commonwealth witnesses] to cooperate with the investigation . . . and chose to remain silent." *Id.* at 378–79, 581 A.2d at 155. In addition, the court stated that the jury was persuaded to believe that the witnesses were telling the truth because the government's documents said so. *Id.*

In *Commonwealth v. Tann*, 500 Pa. 593, 459 A.2d 322 (1983), the Commonwealth intended to call two witnesses with whom they had negotiated plea bargains which provided for leniency in exchange for their testimony for the Commonwealth. *Id.* at 600, 459 A.2d at 326. Before the Commonwealth called the witnesses, however, it called the witnesses' lawyers to the stand to testify that their clients has been advised of their right to remain silent, but had agreed to waive their Fifth Amendment rights against self-incrimination and to testify truthfully at the defendant's trial. *Id.* at 601–02, 459 A.2d at 326–27. The supreme court found this testimony "eminently prejudicial" and held that this repeated reference to the witnesses' Fifth Amendment right against self-incrimination denied the defendant a fair trial. *Id.* at 603, 459 A.2d

at 327. The court reasoned that "the Commonwealth's use of this unwarranted tactic could only steer the jury to infer that since its witnesses ... waived their Fifth Amendment rights and willingly gave self-incriminating testimony, [their] testimony was the truth and entirely believable." *Id.* at 604, 459 A.2d at 327–28. The court stated that it was "entirely improper for the Commonwealth to invite such prejudicial inferences in the manner employed here." *Id.*

The main concern of the *Tann* and *Bricker* courts was that the defendant's Fifth Amendment rights might have been violated by the implication that the defendant could also have decided not to remain silent or could have testified pursuant to a plea agreement. The instant case does not contain this element and its circumstances are distinguishable from those in *Bricker* and *Tann.* In the instant case, the Commonwealth did not employ such tactics as calling Yeung's attorney to the stand, nor did it request that the jury have the agreement during deliberations. Moreover, there was nothing in the testimony of Yeung which suggests, either implicitly or explicitly, that he gave up his right to remain silent in order to testify against Appellant Lam because the jury was aware of the fact that Yeung's agreement to testify arose from an arrest and charges unrelated to Xu's murder. Specifically, it was defense counsel who, on cross examination of Yeung, emphasized the fact that Yeung would not be prosecuted in Lancaster County for the murder of Xu, and is only facing federal charges in New York. (N.T. 3/15/95 at 104; 3/16/95 at 51).

As in the present case, this court previously had the opportunity to distinguish *Bricker* and *Tann* in *Commonwealth v. Sattazahn,* 428 Pa.Super. 413, 631 A.2d 597 (1993). In *Sattazahn,* the Commonwealth negotiated a plea agreement with a co-conspirator pursuant to which the co-conspirator plead guilty to a lesser charge in exchange for his testimony as the chief prosecution witness. *Id.* at 441–42, 631 A.2d at 612. The trial court allowed the Commonwealth to question the witness regarding the parameters of the plea agreement, including the agreement's requirement to testify truthfully

and honestly. *Id.* On appeal, this court distinguished the circumstances of the case from those in *Tann* and *Bricker* and held that the admission of such testimony by the co-conspirator was not erroneous. *Id.* at 445, 631 A.2d at 614. The court reasoned that,

> "the prosecuting attorney merely questioned [the witness] in order to disclose the existence of his plea agreement with the Commonwealth and to establish the parameters of that agreement. No attempt was made to establish or imply to the jury that [the witness] was giving up his right to remain silent in order to testify against Appellant, nor did [the witness'] testimony give rise to a negative inference because of Appellant's failure to testify at trial. . . . We hold, therefore, that the testimony that [the witness] was to be given a stated sentence for giving truthful testimony, without more, was not error entitling Appellant to a new trial."

*Id.* Further, we noted that this course of conduct was "consistent with the Supreme Court's observation in *Commonwealth v. Bricker*, that it would be appropriate for the Commonwealth to reveal the existence and parameters of a plea agreement through the testimony of the witness who had entered the agreement." *Id.* at 445–46, 631 A.2d at 614.

In the present case, the Commonwealth did nothing more than that which is permitted by *Sattazahn*. At the end of direct examination, Yeung testified briefly regarding his plea agreement and its parameters. Yeung testified that he understood his plea agreement to mean that he had to tell the truth and, if he didn't tell the truth, "then the cooperation will not be good." (N.T. 3/15/95 at 90–91). Further, Yeung indicated that, pursuant to his plea agreement, he hoped that "the judge will minus [his] sentence in court," however he was not aware of the maximum sentence he could receive. (N.T. 3/15/95 at 90). This testimony elicited by the Commonwealth merely established the parameters of the plea agreement and sought to reveal the sentence Yeung would be given in exchange for his testimony and, therefore, did not improperly bolster Yeung's credibility.

■ Although Appellant now claims that counsel was ineffective for failing to object to the court's reading of the plea agreement, a comprehensive review of the record reveals that *both* parties to this proceeding were interested in divulging the full nature and content of Yeung's plea agreement to the jury. In fact, it was defense counsel, rather than the Commonwealth, who emphasized Yeung's plea agreement through numerous references during cross examination which highlighted Yeung's duty to cooperate with the authorities, give complete information, and testify truthfully. (N.T. 3/15/95 at 104; N.T. 3/16/95 at 69).

Presumably to show the witness' bias, defense counsel repeatedly referred to Yeung's plea agreement and the fact that because Yeung agreed to testify and cooperate with the authorities, he was permitted to plead guilty to federal charges in New York and, therefore, would not have to face the death penalty in Pennsylvania in addition to the possibility of a sentence reduction based on the U.S. Attorney's "5–K motion." (N.T. 3/15/96 at 103–104, 129; N.T. 3/16/95 at 51, 56–57).

In addition, defense counsel actually read part of the plea agreement during the cross examination of Yeung to illustrate how Yeung agreed to testify truthfully and, if he should give false or incomplete information, the agreement is violated. (N.T. 3/16/95 at 69). Then, in an attempt at further impeachment, defense counsel questioned Yeung regarding information about his girlfriend that he admittedly failed to provide to the authorities pursuant to his agreement. (N.T. 3/16/95 at 70).

It is apparent from the record that the plea agreement and its contents were an integral part of the defense strategy and trial tactics. Defense counsel consistently utilized the agreement to impeach Yeung's credibility on cross examination. As a result, with the agreement of both parties and upon completion of direct and cross examinations, the court read the full plea agreement to the jury. (N.T. 3/16/95 at 86–100).

■ It is well-established that trial counsel possesses broad discretion in matters of trial strategy and the determination of defense tactics employed during litigation. *Commonwealth v. Fowler,* 447 Pa.Super. 534, 540, 670 A.2d 153, 155 (1996). Yeung was an important Commonwealth witness, and to that extent, the impeachment of Yeung's credibility was crucial to the defense. The record reveals that defense counsel sought to impeach Yeung's credibility through the use of his plea agreement and therefore did not oppose the court's reading of the agreement to the jury. This was a reasonable strategy employed by defense counsel and therefore counsel was not ineffective for failing to object to the reading of the plea agreement. We cannot grant Appellant relief simply because hindsight reveals that his tactical decision was in error.

Accordingly, we find that the testimony elicited by the Commonwealth through direct examination of Yeung does not reach the level or type of improper bolstering of credibility warranting a new trial such as that demonstrated in *Bricker* and *Tann,* and trial counsel was not ineffective for failing to object to the reading of the plea agreement by the court.

■ Appellant next alleges that the Commonwealth compounded the prejudice by mentioning Yeung's plea agreement during closing argument. Appellant contends that in stating that Yeung would face the death penalty if he lied, and in referring to his "obligation to tell the truth," the Commonwealth improperly vouched for Yeung's credibility. In fact, the existence of the plea agreement and its effect on Yeung's testimony was vigorously argued by each side at various stages of the trial.

While the Commonwealth did argue in closing that Yeung had an incentive to tell the truth, there was no suggestion that his plea bargain was safe or complete. *Cf. Reed,* 300 Pa.Super. 224, 446 A.2d 311 (1982) (improper for Commonwealth to state that no charges would be brought as a result of a witness' testimony). The Commonwealth simply reminded the jury that Yeung had a reason to be truthful. There is no error in such a reminder.

Moreover, the defense, in its opening, cross-examinations, and closing, repeatedly called the jury's attention to the fact that a witness' credibility is influenced by his own self-interest. Counsel remarked often on Yeung's obligation to cooperate and to testify truthfully in order to receive the benefit of his bargain, and sought to undermine Yeung's credibility by arguing that his plea required him to "bring in" others, even if they were not involved in any crime. In addition to the parties' arguments on this point, the jury was given a corrupt source instruction regarding Yeung's testimony by the trial court.

We find that based upon both parties' use of the plea agreement, the Commonwealth's closing argument was not an improper bolstering of Yeung's credibility. Thus, counsel was not ineffective for failing to raise a meritless objection.

Appellant's next alleged instance of improper bolstering concerns the testimony of F.B.I. Agent Thomas Troutman. On direct examination, Agent Troutman explained that the F.B.I. tested Yeung's knowledge of the murder and his truthfulness by questioning him about crimes with which the F.B.I. was already familiar, in order to determine whether he was telling the truth. Appellant contends that this response improperly bolstered Yeung's credibility.

Because the trial court has discretion regarding the admission of evidence, we cannot disturb its ruling absent an abuse of that discretion.

In *Commonwealth v. Vidmosko*, 393 Pa.Super. 236, 574 A.2d 96 (1990), *allocatur denied*, 527 Pa. 645, 593 A.2d 418 (1991), the court dealt with a very similar situation. There too a Commonwealth witness explained the process of verifying information supplied by a victim by comparing it with known information from another victim. This court held that the testimony did not usurp the jury's function of assessing credibility, but was merely indicative of a thorough investigation of the complaint. *Id.* at 243–44, 574 A.2d at 99.

Contrary to Appellant's position, Agent Troutman did not testify that Yeung was telling the truth about the murder, nor

did he state that Yeung testified truthfully at trial. Further, the Commonwealth did not rely upon evidence not before the jury to bolster Yeung's credibility. Taken as a whole, Agent Troutman's testimony merely explained how the F.B.I. learned of Yeung's involvement in Xu's murder. The only reference to Yeung's credibility was made within the context of the plea bargaining process. Therefore, counsel was not ineffective for failing to raise a meritless objection.

 Appellant also contends that the testimony of Trooper Bernard Stanalonis of the Pennsylvania State Police improperly bolstered Yeung's credibility. Trooper Stanalonis testified about his first interview with Yeung:

Near the end of the interview I had the photos with me. I decided I would get out the photographs and ask him if he has ever seen any of these people before in his life; and, based on his response, maybe heightened [sic] my thoughts of how truthful he was being with me, whether he could identify certain people or couldn't identify certain people.

(N.T. 3/20/95 at 85.) A picture of Appellant was among those shown to Yeung. After the photograph was placed on the table, Trooper Stanalonis testified that Yeung commented, "[T]hat's the woman! That's the one that paid me! or hired me, one of the two." (*Id.* at 86.) Appellant alleges that trial counsel compounded the erroneous bolstering by eliciting from Trooper Stanalonis on cross-examination that he believed Yeung was telling him "a correct story corroborating my investigation." (*Id.* at 96.)

Trooper Stanalonis's expression of belief in Yeung's veracity at the time of the investigatory interview did not create undue prejudice depriving Appellant of a fair trial. First, as the Commonwealth notes, identification of Appellant was not at issue. Second, taken in context of the testimony regarding how Yeung's involvement in the murder became known, the trooper's testimony was a proper explanation of investigative procedures. Finally, Trooper Stanalonis did not testify that Yeung's testimony at trial was truthful. While it might have been more prudent to excise the reference to truthfulness, this

one passing remark cannot be said to have caused such undue prejudice as to deprive Appellant of a fair trial.

Further, even if the testimony was improper, its admission was harmless. Harmless error exists if the Commonwealth proves that the error did not prejudice Appellant or that any prejudice was *de minimis*, that the erroneously admitted evidence was cumulative of other properly admitted evidence which was substantially similar or the same as the erroneous evidence, or that the properly admitted and uncontradicted evidence of guilt was so overwhelming that the prejudicial effect of any error was so insignificant that it could not have contributed to the verdict. *Commonwealth v. Simmons*, 541 Pa. 211, 236, 662 A.2d 621, 633 (1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 945, 133 L.Ed.2d 870 (1996). Based upon the fact that Trooper Stanalonis's testimony concerning Yeung's truthfulness was substantially similar to that of Agent Troutman's, the fact that the reference was a single, unsolicited remark made in passing, and that identification of Appellant was never in question, even if any error occurred in admitting the testimony, it was not such as to require relief. Thus, trial counsel was not ineffective in this regard.

■■■■■■ Appellant's final allegation of improper bolstering concerns Agent Troutman's response to a question about Asian gangs. When asked whether he had ever heard of such a gang having intentionally killed an extortion victim or a member of the victim's family, the agent responded in the negative. Defense counsel objected after the answer; therefore, Appellant does not argue that counsel was ineffective. Rather she contends that this testimony was inadmissible because it was hearsay, irrelevant, and germane to the ultimate issue of the trial, thus invading the province of the jury concerning Yeung's credibility. Appellant further observes that Troutman was not qualified to render an expert opinion on Asian gangs, a point which the Commonwealth does not contest.

As stated above, the admissibility of evidence is a matter committed to the discretion of the trial court. Evidence is

relevant if it tends to prove or disprove a material fact, or tends to make a fact at issue more or less probable. *Commonwealth v. McGowan,* 535 Pa. 292, 295, 635 A.2d 113, 115 (1993). Based upon the defense theory that members of the Fuk Ching crime gang carried out the murder to extort money from Wing Cheng, evidence concerning the behavior of Asian gangs is clearly relevant, as it tends to disprove that extortion by the Fuk Ching was the reason for the murder.

Hearsay is an out-of-court statement offered for the truth of the matter asserted therein. *Commonwealth v. Jones,* 530 Pa. 591, 615, 610 A.2d 931, 942 (1992). Troutman did not testify to an out-of-court statement. Rather, he testified that he had never heard of Asian gangs behaving as did the murderers in the instant case. This was not hearsay but a fact which the defense was free to attack on cross-examination. Nor did the testimony invade the province of the jury: the conclusion to be drawn from the agent's evidence was not that Yeung must be telling the truth because Troutman never heard of Asian gangs acting in a certain manner.

The testimony of a witness, whom both parties agree is not an expert, on a topic for which there may be no proper basis, is not necessarily inadmissible, but is rather, a question of weight for the jury. Accordingly, there was no error in the admission of this evidence.

Appellant's second allegation of error is that the conversation of co-defendant Xie with F.B.I. Agent Peter Lee should not have been admitted into evidence, as it was inadmissible hearsay and violated her right of confrontation.

In 1994, Yeung, cooperating with state and federal authorities, initiated contact with Xie concerning further payment for the murder. Subsequently, undercover state and federal agents met with Appellant, announcing that they were associated with Yeung and on his behalf were seeking to collect the remaining $15,000 owed for Xu's murder. The agents gave Appellant their beeper number. Immediately thereafter, phone calls from Appellant's place of business were made to the co-defendants. The next day, Xie contacted the agents

through their beeper. After several conversations with Agent Lee, Xie agreed to pay an additional $10,000.

An exception to the hearsay rule permits an out-of-court declaration of one co-conspirator to be admitted against another co-conspirator provided that the declaration was made during the conspiracy and in furtherance of it. *Commonwealth v. Lambert*, 529 Pa. 320, 334–35, 603 A.2d 568, 575 (1992) (*citing Commonwealth v. Coccioletti*, 493 Pa. 103, 111, 425 A.2d 387, 391 (1981)). In addition, the fact that a declaration of a co-conspirator was made to undercover law enforcement officers or non-conspirators does not take the declaration out of the co-conspirator exception. *Commonwealth v. Moyers*, 391 Pa.Super. 262, 269, 570 A.2d 1323, 1326–27 (1990).

The conspiracy, for purposes of the hearsay exception, may be inferentially established by showing the relation, conduct, or circumstances of the parties. *Commonwealth v. Chester*, 526 Pa. 578, 593–94, 587 A.2d 1367, 1374–75 (1991), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). With respect to the introduction of evidence under the co-conspirator exception, the Commonwealth is only required to show by a fair preponderance of the evidence that a conspiracy existed. *Commonwealth v. Mayhue*, 536 Pa. 271, 293, 639 A.2d 421, 432 (1994). The duration of a conspiracy depends upon the individual facts of each case. *Chester*, 526 Pa. at 593, 587 A.2d at 1374. Additionally,

> the fact that the 'central objective' of the conspiracy has been nominally attained does not preclude the continuance of the conspiracy. Where there is evidence that the conspirators originally agreed to take certain steps after the principal objective of the conspiracy was reached, or evidence from which such an agreement may reasonably be inferred, the conspiracy may be found to continue.... The crucial factor is the necessity for some showing that the later activities were part of the original plan.

*Commonwealth v. Evans*, 489 Pa. 85, 90–93, 413 A.2d 1025, 1029 (1980) (citations omitted).

At issue is whether the conspiracy was still on-going when Xie spoke with Agent Lee almost two years after the murder. Appellant alleges that once the murder occurred, the conspiracy ended. The Commonwealth contends that the parties had originally agreed that Yeung would be paid $30,000 in two installments, and since he had not yet been paid in full, the conspiracy was still continuing.

An examination of the record indicates sufficient evidence from which it may be inferred that the conspiracy had not ended with Xu's murder. Yeung testified that at his initial meeting with Appellant and Bick Yung Cheng, Appellant stated that she could only advance $15,000, but agreed to pay more when she had the money. Although Xie stated during his conversation with Agent Lee that the demand for additional money was not part of the original deal, he was not present at the meeting at which financing the murder was discussed. Therefore, we hold that the trial court did not error in admitting the testimony under the co-conspirator exception to the hearsay rule.

Appellant additionally contends that the use of Xie's conversations violated the Confrontation Clause of the Sixth Amendment of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution because Xie did not testify and therefore was not subject to cross-examination. The admission of a non-testifying co-conspirator does not violate a defendant's right of confrontation when the declaration possesses strong indicia of reliability. *Commonwealth v. Cull*, 540 Pa. 161, 170, 656 A.2d 476, 480 (1995). Factors which evidence reliability include whether: 1) the statement was spontaneous; 2) the statement was against the declarant's penal interest; and 3) cross-examination of the declarant would not have shown that the statement was not reliable. *Id.*

First, Xie quickly contacted Agent Lee almost immediately after the Agent's beeper number had been supplied to Appellant. Thus, his declarations were made spontaneously. Second, Xie's statements to Agent Lee concerning the payment of

the money to keep Yeung from exposing those involved in the murder were clearly against Xie's penal interests. In addition, Xie had no reason to lie about his willingness to pay the additional money. Finally, cross-examination would not necessarily have shown that the declarations made by Xie were unreliable. During his conversation with Appellant, Agent Lee repeatedly stated that Yeung needed the extra $15,000. Given the evidence of the calls from Appellant's restaurant immediately after the agents' visit, and Xie's almost immediate contact with Agent Lee after Appellant received the beeper number, cross-examination of Xie would not have shown his statement that he was paying the money for Appellant to be unreliable.

Based upon the reliability of Xie's statements to Agent Lee, we find that Appellant's confrontation rights were not violated.

Appellant also alleges that the Commonwealth should be judicially estopped from arguing a position during closing argument which was different from its theory at trial. Appellant contends that the Commonwealth successfully asserted during the trial that Xie's taped conversation should be admitted into evidence based upon the co-conspirator exception because the original plan was to pay Yeung $30,000 in two separate installments. Because the plan called for the second payment to be made subsequent to commission of the crime, Xie's later contact with Agent Lee and payment of the money was consistent with the original plan.

However, Appellant insists that the Commonwealth presented an inconsistent theory during closing argument when it pointed out that Xie, in his taped conversation, claimed that Yeung was lying about the additional money. The prosecutor then stated, "How does he know that he's lying about the thirty thousand, that he's lying about an additional fifteen thousand being owed? He knew about the original contract," (N.T. 3/21/95, 3:30 p.m., at 75) and further, "Is that somebody who has just learned about this? Is that somebody who only a few days ago heard about this?" (Id. at 77.) Defense counsel's objection was overruled.

We find the Commonwealth's closing was not inconsistent with its earlier argument. As Yeung testified, and Xie stated to Agent Lee, Xie was not present at the original meeting. (N.T. 3/15/95 at 38; 3/17/95 at 114–15.) Thus, although Xie was aware of the original contract, he was not necessarily conversant with all of its details. In addition, as the Commonwealth observes, Xie's having told Agent Lee that Yeung lied about the additional money does not necessarily mean that he did not know of the balance due. During his conversation with Agent Lee, Xie successfully persuaded Agent Lee to accept $10,000, not the $15,000 requested. Therefore, Xie had a reason to mislead Agent Lee about the original plan.

■ Appellant's third issue concerns her own recorded conversation with Agent Lee which she contends should have been suppressed as having been obtained involuntarily in violation of the Due Process Clause of the Fifth Amendment of the United States Constitution. Appellant alleges that her statement was made under duress and coercion because the agents posed as members of a violent Asian gang. Appellant also seeks to suppress, based upon the fruit of the poisonous tree doctrine, evidence of the resulting phone calls to her co-defendants which emanated from her business, the call from Xie to Agent Lee's beeper the next day, and any further contacts between Xie and the agents.

■ In reviewing a ruling of a suppression court, we must ascertain whether the record supports the court's factual findings. *Commonwealth v. Hughes*, 536 Pa. 355, 366–67, 639 A.2d 763, 769 (1994). In doing so, we may only consider the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. *Id.* at 367, 639 A.2d at 769. If the record supports the court's findings, we may only reverse if the court drew an erroneous legal conclusion from the facts. *Id.*

■ In order for a defendant's statements to be admissible, they must be freely and voluntarily given and must not be extracted by any sort of threats or violence *Commonwealth v. Nester*, 443 Pa.Super. 156, 161, 661 A.2d 3, 5 (1995), *allocatur*

*granted,* 543 Pa. 726, 673 A.2d 333 (1996). The defendant's will must not have been overborne nor her capacity for self-determination critically impaired. *Commonwealth v. Clark,* 516 Pa. 599, 605, 533 A.2d 1376, 1379 (1987) (citing *Commonwealth v. Smith,* 470 Pa. 220, 225, 368 A.2d 272, 275 (1977)).

The suppression court held that Appellant's statements were made voluntarily. We agree. Although the Fuk Ching was known for violence, the agents' statements that they would not be as "polite" next time, and that if she did not pay "we will hold up together and die together," were insufficient to overcome Appellant's will and self-determination. Appellant never wavered from her repeated contention that she did not know what the agents were referring to, nor did Appellant contact the police after the agents left.

■ Appellant also argues that even were her statements voluntary, they should be suppressed because they were recorded in violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S.A. § 5701 *et seq.* At issue is whether the wiretap, which properly complied with the federal wiretap statute, 18 U.S.C. § 2510 *et · seq.*, was nonetheless violative of our state's Wiretap Act based upon the involvement of the state police.

The Wiretap Act generally prohibits the interception or disclosure of oral communications. However, there are statutorily provided exceptions:

It shall not be unlawful under this chapter for:

 * * * * * *

(2) Any investigative or law enforcement officer or any person acting at the direction or request of an investigative or law enforcement officer to intercept a wire, electronic or oral communication involving suspected criminal activities where:

(i) such officer or person is a party to the communications; or

(ii) one of the parties to the communication has given prior consent to such interception.

18 Pa.C.S.A. § 5704. If section (2)(ii) is used, either the Attorney General's office or the district attorney's office in the county of the locus of the wiretap must review the facts and give prior approval.

The Wiretap Act also provides:

Any person who, by any means authorized by the laws of another state or the Federal Government, has obtained knowledge of the contents of any wire, electronic or oral communication, or evidence derived therefrom, may disclose such contents or evidence to an investigative or law enforcement officer and may disclose such contents or evidence where otherwise admissible while giving testimony under oath or affirmation in any proceeding in any court of this Commonwealth.

18 Pa.C.S.A. § 5717(c).

The suppression court found that the recording of the conversations by the federal and state authorities was legal, and that no attempt had been made to circumvent the Wiretap Act. Based upon our review of the record, we agree.

This investigation was carried out by federal and state officials acting in concert. The first recording was made at Wing Cheng's restaurant in Lancaster County after Trooper Stanalonis of the Pennsylvania State Police received authorization from the Lancaster County district attorney's office to tape conversations with Appellant and Wing Cheng. Agent Lee and state police Trooper Pak Yeun, both wearing body wires, conversed with Wing Cheng, while Trooper Stanalonis and Agent Troutman monitored the recording.

Four hours after the meeting with Wing Cheng, and based upon the fear that he might alert Appellant and the others involved in the murder, the agents met with Appellant at her restaurant in Montgomery County. Although authorization to record Appellant's conversation was obtained in Lancaster County, authorization was not sought in Montgomery County. However, both troopers testified that they terminated their interception and recording equipment upon leaving Lancaster County. Thus, although the troopers were present, the con-

versation with Appellant was intercepted and recorded by the federal agents only.

The suppression court's ruling is completely consistent with well-settled law. In *Commonwealth v. Trignani*, 334 Pa.Super. 526, 483 A.2d 862 (1984), and *Commonwealth v. Taraschi*, 327 Pa.Super. 179, 475 A.2d 744 (1984), this court held that notwithstanding the fact that an investigation is carried out jointly by federal and state authorities, the interception of communications is valid if it complies with federal law. Furthermore, the court found no evidence of any attempt to circumvent the Wiretap Act. *See also Commonwealth v. Sears*, 420 Pa.Super. 123, 616 A.2d 10 (1992) (no attempt to circumvent when state authorities had no active investigation of appellant at the time federal investigator sought state assistance).

In the instant case, the federal investigation was already in progress before state police became involved. Further, state authorities did comply with section 5704. The mere presence of state troopers during the interception and recording of the conversation with Appellant did not infringe the Wiretap Act. Thus, Appellant's contention that the Wiretap Act was violated fails.

■ Appellant's fourth claim is that admission of the conversation between Agent Lee and Wing Cheng was error because it was irrelevant, inadmissible hearsay, and extremely prejudicial. Appellant also contends that trial counsel was ineffective in withdrawing an objection to Wing Cheng's testimony concerning his conversation with Agent Lee.

During Agent Lee's testimony, his recorded conversation with Wing Cheng was read into evidence. Throughout the twenty-seven pages of the transcript which the conversation occupies, Wing Cheng stated numerous times that he suspected Appellant was involved in the murder.

■ It is well-established law that certain out-of-court statements offered to explain the course of police conduct and not the truth of the matters asserted therein are admissible as an exception to the hearsay rule. *Commonwealth v. Jones,*

540 Pa. 442, 451, 658 A.2d 746, 751 (1995). The trial court, which has discretion in this matter, must balance the need for the statement versus any prejudice arising from it. *Id.*

In *Jones*, the court held that no error occurred in allowing a police officer to testify to certain statements made to him by the defendant's close friend. *Id.* at 452, 658 A.2d at 751. The defense attacked the manner and thoroughness of the police investigation in an attempt to persuade the jury that another suspect could have committed the murder. *Id.* at 451, 658 A.2d at 750. The testimony of the police officer provided the jury with a comprehensive review of the investigation, including all the rumors and leads received, as well as the statements of the defendant's friend. *Id.* at 451, 658 A.2d at 751. Because the defendant had attacked the competency of the investigation, the court held that it was necessary for the Commonwealth to explain the course of the investigation. *Id.*

The *Jones* court also based its holding on the fact that the defendant's friend, the declarant, testified in court and was subject to cross-examination. *Id.* In so doing, the court distinguished two cases which Appellant relies upon, *Commonwealth v. Yates,* 531 Pa. 373, 613 A.2d 542 (1992), and *Commonwealth v. Palsa,* 521 Pa. 113, 555 A.2d 808 (1989). In those cases, the court held that the testimony of a police officer regarding statements of a declarant who did not testify and was therefore not available for cross-examination, was improperly admitted.

As in *Jones*, the conversation read into evidence in the instant case related to matters concerning which Wing Cheng had given evidence: Wing Cheng, who was available for cross-examination, testified that he told Agent Lee he suspected Appellant was the person who owed the remaining money. During Wing Cheng's testimony, the trial court informed the jury that the witness' account of his part in the conversation was significant not for what was said, but to show his reaction to Agent Lee's request for further payment. The judge also instructed the jury that Wing Cheng's suspicions were irrelevant and should be disregarded, and that what the undercover agent said during the conversation was not necessarily being

offered for its truth. In addition, during the taped conversation between Agent Lee and Appellant which was properly admitted into evidence, Appellant stated that "everybody" in Chinatown suspected her involvement in the murder. (N.T. 3/17/95 at 22.)

The defense in the instant case, as in *Jones*, attempted to persuade the jury that persons other than the accused were responsible for the murder. The defense theory here was that the Fuk Ching had murdered Xu in order to extort money from Wing Cheng. Thus, the evidence of Wing Cheng's reaction to people he believed to be Fuk Ching members was relevant: it went to the issue of whether the murder was for extortion purposes. Accordingly, there was no abuse of the trial court's discretion in allowing the transcript of Wing Cheng's conversation to be read into evidence, nor was trial counsel ineffective for withdrawing his objection to Wing Cheng's testimony regarding the conversation.

 Appellant's final assignment of error involves alleged misconduct by the Commonwealth during closing argument. She also contends that trial counsel was ineffective for not objecting.

Appellant presented three character witnesses who testified to her reputation as a peaceful, law-abiding citizen. During cross-examination, the Commonwealth emphasized the fact that the witnesses did not know her reputation from 1988 to 1992, the period during which the murder was planned and executed. In closing argument, the Commonwealth stated the following:

> [Y]ou have to evaluate not only the fact that the testimony is said on the witness stand, you have to evaluate the quality of what is said . . .

> I suggest to you under the evidence that was submitted, she was a danger to Rong Rong Xu, and what becomes important then is that period in 1988 and 1992. What is important is whether we can cross-examine character witnesses from 1988 to '92: What did you know about this grudge against Rong Rong Xu? You heard about it. Does

that affect the people in the community that know about it? Does that affect their understanding of her reputation? I suggest to you the type of reputation evidence submitted just is not up to snuff.

(N.T. 3/21/95, 3:30 p.m., at 65–66.)

Appellant contends that these comments directed the jury to draw an adverse inference of her character from 1988 to 1992, and suggested that there should have been other, more appropriate character witnesses called.

Comments by the Commonwealth during closing argument do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury by causing them to feel such bias against the defendant that they are unable to weigh the evidence objectively and return a true verdict. *Commonwealth v. Strong,* 522 Pa. 445, 454, 563 A.2d 479, 483 (1989), *cert. denied,* 494 U.S. 1060, 110 S.Ct. 1536, 108 L.Ed.2d 775 (1990), (citing *Commonwealth v. McNeal,* 456 Pa. 394, 400, 319 A.2d 669, 673 (1974)). The trial court has discretion in this matter, and our inquiry is limited to determining whether the court abused that discretion. *Id.*

The Commonwealth may not ask the jury to draw an adverse inference from a defendant's failure to call reputation witnesses. Appellant relies on *Commonwealth v. Brown,* 492 Pa. 320, 324, 424 A.2d 1211, 1212 (1981), for the proposition that the Commonwealth's remarks concerning the reputation witnesses were reversible error. In *Brown,* the Commonwealth asked the jury in its closing argument, "Where are the school teachers to say that this gentleman is a good boy or a good man? If you were on trial, or a member of your family were on trial, how many people could you get to come in here?" *Id.* at 322, 424 A.2d at 1211. The court held that such comments went beyond attacking the quality of the character witnesses that were called, and instead invited the jury to draw adverse inferences from the lack of witnesses. *Id.* at 324, 424 A.2d at 1213.

However, *Commonwealth v. Van Cliff,* 483 Pa. 576, 397 A.2d 1173 (1979), *cert. denied,* 441 U.S. 964, 99 S.Ct. 2412, 60

L.Ed.2d 1070 (1979), presents a situation more analogous to the instant case than does *Brown*. In *Van Cliff*, the Commonwealth, referring to character witnesses called by the defendant, stated, "I think you should know that all of these people who came before you are relatives of the defendant. I think that's relevant. There weren't any members of the community who were not relatives who came forward and testified as to his quote 'good character'" *Id.* at 582, 397 A.2d at 1176. The court found that the comments were proper because they addressed the quality of the defense witnesses by noting that they were biased or interested. *Id.* at 586, 397 A.2d at 1178.

Similarly, the Commonwealth in the instant case did not attempt to establish an impermissible negative inference in the jurors' minds. Rather, the Commonwealth pointed out that none of Appellant's character witnesses knew Appellant's reputation during the relevant period from 1988 to 1992. Such a comment was consistent with case law holding that the quality of a defendant's character evidence may be assailed in closing argument. Taken as a whole, the Commonwealth's closing was a valid assessment of the quality of the character witnesses.

Also, in regard to character evidence, Appellant alleges that the Commonwealth improperly argued the existence of a grudge Appellant held against the victim when there was no evidence of such ill-feeling. However, we note that during the reading of the transcript of Appellant's recorded conversation with Agent Lee, she stated that, "Maybe I have hatred with her very deep, deepest hatred with her is me. The deepest hatred with her is me." (N.T. 3/17/95, at 96.) Thus, there was evidence on the record of Appellant's very negative feelings toward Xu.

Appellant is correct on one point: she claims that no potential witness could have been interrogated concerning knowledge of any grudge borne by Appellant's against Xu. Such a question would not be a proper vehicle to explore a witness' standard of what constitutes good reputation, an inquiry which is a proper subject of cross-examination. *Com-*

*monwealth v. Becker,* 326 Pa. 105, 114, 191 A. 351, 356 (1937); *Commonwealth v. Adams,* 426 Pa.Super. 332, 335, 626 A.2d 1231, 1233 (1993), *allocatur denied,* 535 Pa. 672, 636 A.2d 631 (1993). Thus, a character witness may be asked specific questions concerning his ability to make sound value judgments, and the inquiry made of Appellant's witnesses were of this nature. There was no error involved.

Judgment of sentence affirmed.

CAVANAUGH, J., files a dissenting opinion.

CAVANAUGH, Judge, dissenting.

Because I believe that our supreme court's decision in *Commonwealth v. Bricker,* 525 Pa. 362, 581 A.2d 147 (1990) requires the grant of a new trial, I respectfully dissent. The majority distinguishes the present case on the basis, *inter alia,* that the plea agreement entered into by Yeung was for crimes unrelated to the murder of the victim in this case, and furthermore, that there was no suggestion that Yeung gave up his right to remain silent in order to cooperate. After reviewing the plea agreement, however, I am of the opinion that this conclusion is in error. Although Yeung was not charged by the Lancaster County District Attorney with the murder of the victim, he did plead guilty, as part of his plea bargain with the U.S. Attorney, to murder for hire in relation to the death of the victim in this case. At trial, the plea agreement was read by the court to the jury during trial and these facts were clearly stated in the agreement. Moreover, from this verbatim recitation of the plea agreement, the jury could reasonably infer that appellant had the same opportunity to cooperate as Yeung, but instead chose to remain silent.

In *Bricker,* two Commonwealth witnesses entered into plea agreements in which they agreed to provide truthful testimony at defendant's trial. These agreements were sent out with the jury during deliberations. Each contained numerous references to each witness's obligation to provide complete and truthful information. Additionally, the agreements were signed by the witnesses, their attorneys, the U.S. Attorney,

the Commonwealth's Attorney General and the District Attorney. Our supreme court noted that in so executing these documents, the signatories placed the imprimatur of their offices as support for the proposition that the witnesses were telling the truth. In concluding that the Commonwealth impermissibly bolstered the credibility of the witnesses and thereby violated the defendant's right to a fair trial, the court stated:

> In the case sub judice, the introduction of the plea agreements served as silent witnesses, causing the same prejudice to appellant as we held to be reversible error in [Commonwealth v. Tann, 500 Pa. 593, 459 A.2d 322 (1983) ]. With the agreements before them, the jurors could reasonably infer that appellant had the same opportunity as Rossi and Kellington to cooperate with the investigation of Thomas Sacco's death, and chose to remain silent. The fact that appellant did not take the stand in his own defense further bolsters his claim that there is a reasonable possibility that this error might have contributed to the verdict. [Commonwealth v. Story, 476 Pa. 391, 383 A.2d 155 (1978) ].

> The Commonwealth argues that the plea agreements had to be revealed to the jury; and had they not been revealed the Commonwealth would now be attacked for misconduct. This argument avoids the real issue. It would have been appropriate for the Commonwealth to reveal the existence of the agreements, and the parameters thereof, through the testimony of the witnesses. If they still felt it necessary to enter the documents into evidence they simply could have redacted portions of the agreements to delete the prejudicial aspects, as requested by defense counsel, prior to submission of them to the jury. To allow the jurors to read these unredacted documents at their leisure during deliberations runs afoul of the Tann case and the requirements of fundamental fairness.

Id. at 377–79, 581 A.2d at 154–55.

Here, although the plea agreements were not sent out with the jury, the court read to the jury two letters which embodied the substance of the agreement between the Commonwealth and Yeung. With respect to the first letter, the court

indicated that it was written on U.S. Department of Justice letterhead. The court then went on to read the terms of the agreement, which stated that Yeung agreed to "truthfully disclose all information," "cooperate fully" with law enforcement, "truthfully testify" before the grand jury and at trial, recognized his "obligation of truthful disclosure," and his obligation to, "at all times give complete, truthful and accurate information and testimony." The court then went on to indicate that the letter was signed by the assistant United States Attorney, that it was approved by the chief attorney in that office and that it was agreed and consented to by Yeung and his attorney.

The second letter read by the court is from the Lancaster County District Attorney. It is a confirmation of the agreement that Yeung would plead guilty to the federal crime of murder for hire in connection with the homicide of the victim in this case. The letter further states that Yeung would not be prosecuted for the victim's homicide in Lancaster County, and highlights his agreement to testify truthfully in appellant's trial.

By reading these letters to the jury, the court went far beyond informing the jury of the existence of the plea agreement and its parameters. Highlighting Yeung's obligation to be truthful and the Commonwealth's and U.S. Attorney's full participation in and endorsement of the plea agreement served to support the proposition that Yeung was telling the truth. Such disclosure could only serve to bolster Yeung's credibility. Having been apprised of the detailed aspects of the agreement, the jury could have reasonably inferred that appellant had the same opportunity as Yeung to cooperate but chose instead to remain silent. I would, therefore, conclude that appellant was prejudiced by the Commonwealth's improper bolstering of Yeung and would grant a new trial.[1]

I would also conclude that a new trial is warranted due to the improper bolstering of Yeung by two Commonwealth

1. I also note my disagreement with the majority's conclusion that defense counsel pursued a reasonable strategy in agreeing that the plea agreement be read to the jury. While it was both reasonable and prudent for defense counsel to highlight the favorable treatment Yeung

witnesses, F.B.I. Agent Thomas Troutman and Pennsylvania State Police Trooper Bernard Stanalonis.

Generally speaking, it is improper for the prosecution to *vouch* for the credibility of a government witness. Vouching has been characterized in two categories: (1) when the prosecution places the prestige of the government behind the witness by personal assurances of the witness's veracity; and (2) when the prosecution indicates that information which is not before the jury supports the witness's testimony. See *e.g.*, *United States v. Winter*, 663 F.2d 1120 (1st Cir.1981); *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir.1980), on remand, 640 F.2d 225 (1981), cert. denied, 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981).

*Commonwealth v. Reed*, 300 Pa.Super. 224, 446 A.2d 311, 314 (1982). Both Agent Troutman and Trooper Stanalonis vouched for Yeung's credibility by indicating that information which was not before the jury supported his testimony. Agent Troutman testified that Yeung's knowledge of the murder and his truthfulness was tested by questioning him about other crimes with which the F.B.I. was already familiar, in order to determine whether he was telling the truth. Implicit in such testimony is that Yeung gave truthful and correct information about these other crimes, and that, having provided truthful information as to other crimes, the F.B.I. was confident that the information provided by Yeung in the present case was also truthful.

With respect to Trooper Stanalonis, he explained how he tested Yeung's knowledge of the murder and whether Yeung was being truthful by showing him photographs of people including appellant. The trooper stated that Yeung immediately identified appellant from among these photographs. Implicit from such testimony is that Yeung, having demonstrated knowledge which was already known or could be verified by

received from the Commonwealth, it was unnecessary and counterproductive to read verbatim the terms of the plea agreement, which only served to highlight Yeung's obligation to tell the truth and law enforcement's participation in and endorsement of the plea agreement. This course of action, rather than impeaching the credibility of Yeung, served only to bolster it.

police, had provided information about the present case which police believed was truthful.

In each of these instances, law enforcement officials provided testimony that they tested Yeung to determine whether he was a truthful individual. According to these officials, they were satisfied with the performance of Yeung in answer to their respective inquiries. From this testimony, the jury would likely draw the reasonable inference that law enforcement officials believed that Yeung had testified truthfully. In these circumstances, I would conclude that the credibility of the witness was improperly bolstered and that a new trial should be awarded.

I agree with the majority opinion as to the remaining issues but, since, as set forth above, I believe the court improperly permitted the prosecution to bolster its case by lending to it the moral suasion of voucher by respected government officers and agents, I would reverse and grant a new trial.