J. S27004/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA     :     IN THE SUPERIOR COURT OF
                                       :            PENNSYLVANIA
                v.                  :
                                         :
KEITH EPPS,                       :            No. 1223 EDA 2014
                                         :
             Appellant        :

Appeal from the Judgment of Sentence, December 1, 2011,
in the Court of Common Pleas of Philadelphia County
Criminal Division at Nos. CP-51-CR-0012195-2009,
CP-51-CR-0012200-2009, CP-51-CR-0012204-2009

BEFORE: FORD ELLIOTT, P.J.E., STABILE AND FITZGERALD,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:      **FILED NOVEMBER 24, 2015**

Keith Epps appeals from the judgment of sentence of December 1, 2011, following his conviction of two counts of second-degree murder and robbery, one count of burglary, and three counts of criminal conspiracy.[1] After careful review, we vacate two of his convictions for criminal conspiracy, but affirm in all other respects.

The trial court has summarized the facts of this case as follows:

> This matter arises out of the shooting deaths of Rian Thal and Timothy Gilmore, the victims herein on June 27, 2009, during a robbery inside of the Piazza Navona apartments located in the Northern Liberties section of Philadelphia. The evidence

---

* Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(b), 3701, 3502, and 903, respectively.

demonstrated [t]hat defendant orchestrated the plan to rob the victims herein.

Rian Thal was a party promoter [and] also was involved in the selling of powder cocaine. She was specifically targeted because word had gotten out that she was to receive a shipment of approximately one half million dollars' worth of powder cocaine, which amounted to eleven or twelve kilos of powder cocaine, which was being transported from Texas to Philadelphia.[Footnote 2] The two drug couriers, Timothy Gilmore and Edward Emerson,[Footnote 3] transported the drugs by way of a tractor-trailer to Philadelphia.

> [Footnote 2] Rian Thal's business partner, Leon Woodard, was responsible for setting up the deal with a Texas dealer, Kevin Harks, a/k/a Big Bank Hank, who was interested in breaking into the Philadelphia market to sell Mexican cocaine. Mr. Woodard is currently serving 262 months in federal prison for drug trafficking.

> [Footnote 3] Mr. Emerson received thirty-six months in federal prison for the charge of drug trafficking.

On the Friday before the murders, Leon Woodard moved the cocaine into Ms. Thal's apartment on the seventh floor of the Piazza Navona. Accompanying Mr. Woodard was a man named Vernon Williams, who Ms. Thal did not permit into her apartment because she did not trust him.[Footnote 4] At trial, Mr. Woodard testified at trial [sic] that Mr. Williams left his cell phone in Mr. Woodard's vehicle. After the murders occurred, Mr. Woodard saw text messages between Mr. Williams and Antonio Wright that indicated Mr. Woodard was being set up.[Footnote 5] Unbeknownst to Ms. Thal or Mr. Woodard, Mr. Williams contacted defendant about the shipment

of cocaine and the drug money tied to its purchase and a plan was hatched to steal it.

> [Footnote 4] Mr. Williams died in a car accident a month after the murders occurred.

> [Footnote 5] Cell phone records confirmed that Wright sent a text message to Mr. Williams saying, "Yo, dawg, we need this.  This is a big one.  We can't let this one get by us."

Defendant thereafter contacted a friend named Katoya Jones, who lived in the building, and asked her to help him enter the apartment in exchange for a cut of the profits should the robbery scheme succeed.[Footnote 6]  Approximately 3:30 a.m., that Saturday, the 27th, the day of the murders, defendant called Ms. Jones to let him and his friend, Robert Keith, into the building.  After they entered the building, their attempt to steal the drugs and money failed because they broke into the wrong apartment.

> [Footnote 6] The building required both a key and security code to enter.

Instead of taking that as a sign that the scheme would go awry, the next afternoon, at about 2:00 p.m., defendant called Ms. Jones again to tell her to allow a friend of his into the building within the next hour.  Defendant conspired with three men, Donnell Murchison, Langdon Scott[Footnote 7], and Edward Daniels to carry out the robbery.  Around 3:00 p.m., that same day, Ms. Jones opened the locked front door to the apartment building to allow Murchison to enter.  Mr. Murchison then opened the door for Daniels and Mr. Scott.  Mr. Scott was under the impression that he was buying $4,500 worth of powder cocaine.

> [Footnote 7] Mr. Scott was permitted to enter an open guilty [plea] to the

charges of robbery, conspiracy, and burglary in exchange for his testimony.

According to [Mr.] Scott's testimony, once all three men were in the elevator,[Footnote 8] Murchison informed Mr. Scott that when he went to buy the drugs from Mr. Gilmore and Ms. Thal, he and Daniels were going to rob them. At that point, Mr. Scott decided not to go through with the buy and all three of them left the apartment building to report back to defendant, who was sitting in a white van outside of the apartment building. While Murchison waited outside of the van, Mr. Scott and Mr. Daniels entered the van to talk with defendant.

[Footnote 8] The three men entered the building once before to carry out the plan, but after Murchison learned that Scott did not have the purchase money on him all three men left the building so that Scott could retrieve the money.

After Scott stated that he wanted no part of the robbery, a friend of defendant's, Caesar Holloway, told him that he would take Scott home and get a replacement, who turned out to be Antonio Wright. Around 5:00 p.m., Daniels, Mr. Murchison, and Wright entered the Piazza Navona and proceeded to the seventh floor to wait for Ms. Thal and Mr. Gilmore to return. Wright and Daniels went to one end of the hallway while Murchison went to the other in order to box in the victims. Defendant called Mr. Murchison as the two entered the apartment building.

When Ms. Thal and Mr. Gilmore exited the elevator, Wright and his co-defendants pulled out guns and announced a robbery. When Mr. Gilmore resisted, Wright shot him. Murchison then shot Ms. Thal behind the head killing her instantly. As the three men exited the building, Murchison noticed that Gilmore was still alive and shot him twice in the head killing him. All of the men then entered defendant's van and then fled the scene without the

money or the drugs. Police later discovered four kilos of cocaine and over $100,000 in Ms. Thal's apartment.

Later that evening police identified Ms. Jones as a person of interest because she was observed on a surveillance video twice opening the front door of the apartment building for Murchison. Initially, Ms. Jones lied to police about being involved in the incident and was freed. However, police picked her up again once police reviewed another surveillance video, which showed her letting Robert Keith into the building. Upon being taken into custody, Ms. Jones gave a statement to the detectives and later pleaded guilty to two counts of third-degree murder, one count of conspiracy, two counts of robbery in the first-degree, and one count of burglary.

Police used Ms. Jones' cell phone records and learned that she and defendant had been in contact with one another. After police obtained defendant's cell phone records, the detectives found numerous phone calls to the individuals involved: defendant, Scott, Murchison, Holloway, and Ms. Jones. According to Detective Ron Dove of the Homicide Unit, on the day of the murders, June 27th of 2009, Holloway and defendant communicated with each other 53 times, Williams and defendant 34 times, Robert Keith and defendant 52 times, Ms. Jones and defendant 29 times, Scott and defendant 11 times, Daniels and defendant 4 times, and Murchison and defendant thirty-six times.[Footnote 9]

> [Footnote 9] The phone calls mentioned above were obtained from Mr. Epps' phone number, (215) 207-4472. Special Agent William Shute of the FBI was able to determine using cell tower sites and video surveillance tapes, that Mr. Epps made and received 57 phone calls while in the Piazza Navona on the day of the murders.

Ballistic tests revealed that the bullets recovered from Mr. Gilmore and Ms. Thal belonged to the weapon used by Murchison. After police arrested Daniels he confessed to being involved in the incident. He also admitted shooting Gilmore multiple times. He did not mention anyone else involved in the murders.

During trial, surveillance tapes shown to Scott allowed him to identify Murchison and Daniels as the men with whom he entered the building. After giving testimony at a preliminary hearing, Mr. Scott was stabbed numerous times in prison.[Footnote 10]

[Footnote 10] Mr. Scott's stabbing occurred the day he was moved to the cell block holding Mr. Daniels.

In addition thereto, at trial Mr. Woodard and Ms. Jones identified defendant in a surveillance video. Testimony from Mr. Murchison was stricken from the record after he refused to undergo cross-examination.[Footnote 11]

[Footnote 11] Mr. Murchison pled guilty to two counts of first-degree murder, two counts of robbery, and one count of conspiracy. In return for his plea, the Commonwealth agreed to place him in federal custody for his safety. During his direct testimony, the Commonwealth read in statements he gave to detectives, which implicated the defendant and co-defendants as those men that took part in the robbery-turned-murder. (N.T. 11/18/2011, 32[,] 37-45, 47, 53, 56-57.)

Trial court opinion, 7/30/12 at 2-5.

On December 1, 2011, following a jury trial, appellant was found guilty of two counts each of second-degree murder and robbery. Appellant was

also found guilty of one count of burglary and three counts of criminal conspiracy relating to the murders, robberies, and burglary. On December 1, 2011, appellant was sentenced to consecutive life terms for second-degree murder. Appellant received concurrent sentences on the burglary and conspiracy charges; the robbery charges merged for sentencing purposes. (Notes of testimony, 12/1/11 at 18-20.) This timely appeal followed. Appellant filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. Rule 1925(b), 42 Pa.C.S.A., and the trial court has filed an opinion.

Appellant has raised the following issues for our review:

I.    After prosecution witness Donnell Murchison refused to undergo full and complete cross examination, did the Trial Court err in denying Appellant's motion for mistrial, and in concluding that Appellant's Sixth Amendment rights were sufficiently vindicated by striking the witness' testimony and issuing a curative instruction?

II.   In light of Mr. Murchison's obviously anticipated reluctance to testify, was it error to fail to first question the witness outside the presence of the jury?

III.  Did the Trial Court err in overruling objection to the prosecution's repetitive and leading questions of Donnell Murchison to the effect that he and his family had been threatened, where no such threats had been connected to Appellant?

IV.   Did the Trial Court err by denying Appellant's motion for mistrial following prosecutorial misconduct during the Commonwealth's

> summation, including (a) repeated references to the stabbing of Langdon Scott which had been ruled inadmissible; (b) blatant mischaracterization of the testimony of Officer Vincent DeMayo, and (c) statements *dehors* the record concerning what was allegedly done by police with the phone allegedly belonging to Vernon Williams?
>
> V. Did the Trial Court err in permitting Detective John Cummings to testify as to the hearsay statement of Antoine Thomas, when defense counsel had not attacked the adequacy of the investigation by the police?
>
> VI. Did the Trial Court violate double jeopardy principles by sentencing Appellant on three separate counts of criminal conspiracy, where the Commonwealth's proofs alleged only a single, overarching conspiratorial agreement to steal certain money and drugs?

Appellant's brief at 3-4.

In his first issue for our review, appellant claims that the trial court erred by not declaring a mistrial after Donnell Murchison refused to undergo cross-examination. In exchange for his testimony at trial, Murchison negotiated a plea with the Commonwealth. (Notes of testimony, 11/18/11 at 3-4.) However, Murchison was clearly a reluctant witness. While he agreed that his prior statement to police was true, he repeatedly expressed his reluctance to testify. Eventually, Murchison shut down and basically refused to answer any more questions on cross-examination. (*Id.* at 121-122.)

The trial court denied appellant's motion for mistrial but gave the jury a curative instruction and struck Murchison's testimony in its entirety:

> A couple things, first of all, the delay was we had a witness on the witness stand Friday and we had difficulty getting him in today which is logistics and we finally did get him in and you observed on Friday the fact that he did not answer questions, the majority of the questions. He had some difficulty with the Commonwealth's questions and he did not answer a majority of Mr. Warren's questions and as such, he did not sit for cross-examination, so I am striking his testimony. Now, what that means is you have to strike him from your memory bank as if this witness didn't testify. The fact that he testified to giving a statement, you strike that out. The fact that he testified to certain portions of that statement or the majority of the statement or the whole statement, you strike it out. You are not to consider that when you go back to deliberate. You are not to consider anything about him. The witness' testimony has been stricken and I can't emphasize that enough. It is something that under the law, someone has to sit for cross-examination and I have made the determination this witness will not sit for cross-examination and as such, the testimony, it is as if it never happened. Just put it right out of your minds and we will move on from there.

Notes of testimony, 11/21/11 at 24-26.

> With regard to the denial of mistrials, the following standards govern our review:
>
> > In criminal trials, the declaration of a mistrial serves to eliminate the negative effect wrought upon a defendant when prejudicial elements are injected into the case or otherwise discovered at trial. By nullifying the tainted process of the former trial and allowing a new trial to convene, declaration of a mistrial serves not only the defendant's interests but,

> equally important, the public's interest in fair trials designed to end in just judgments. Accordingly, the trial court is vested with discretion to grant a mistrial whenever the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. In making its determination, the court must discern whether misconduct or prejudicial error actually occurred, and if so, . . . assess the degree of any resulting prejudice. Our review of the resulting order is constrained to determining whether the court abused its discretion.

*Commonwealth v. Hogentogler*, 53 A.3d 866, 877-878 (Pa.Super. 2012), *appeal denied*, 69 A.3d 600 (Pa. 2013) (citations omitted). "The remedy of a mistrial is an extreme remedy required 'only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial tribunal.'" *Id.* at 878 (citations omitted).

"In conducting a criminal trial, the court must protect the rights of the accused under the Sixth Amendment, including the right 'to be confronted with witnesses against him.'" *United States v. Morgan*, 757 F.2d 1074, 1076 (10th Cir. 1985). "[T]he defendant must be provided with an adequate opportunity to fully and fairly cross-examine the witnesses against him." *Id.*, citing *California v. Green*, 399 U.S. 149 (1970). "[T]he right of confrontation includes the right of the accused to use cross-examination to present a defense to the charges against him." *Morgan*, 757 F.2d at 1076 (citation omitted).

In this case, Murchison refused to be cross-examined so the trial court struck his testimony, in its entirety, and cautioned the jury. This was well within the trial court's discretion. *See id.* at 1077, citing *United States v. Nunez*, 668 F.2d 1116, 1121 (10th Cir. 1981) ("The usual remedy when a government witness invokes the Fifth Amendment on cross-examination on matters to which the witness testifies on direct examination is to strike the witness' direct testimony."). *See also United States v. McGlory*, 968 F.2d 309, 344 (3d Cir. 1992), *cert. denied*, 507 U.S. 962 (1993) ("Courts often prevent an emasculation of the confrontation right by striking the testimony of a non-respondent witness. Use of this remedy lies within the district court's discretion.") (citations omitted). When the trial court provides cautionary instructions to the jury in the event the defense raises a motion for mistrial, "[t]he law presumes that the jury will follow the instructions of the court." *Commonwealth v. Brown*, 786 A.2d 961, 971 (Pa. 2001) (citation omitted), *cert. denied*, 537 U.S. 1187 (2003).

Furthermore, we agree with the trial court that there was ample evidence introduced by the Commonwealth, apart from Murchison's stricken testimony, that established appellant's participation in the crimes, including evidence of numerous telephone calls between appellant and other members of the conspiracy. (Trial court opinion, 7/30/12 at 9.) Therefore, the trial court did not abuse its discretion in denying appellant's motion for mistrial and instead striking Murchison's testimony and giving a curative instruction

to the jury. ***McGlory***, 968 F.2d at 344 ("Prejudicial testimony will not mandate a mistrial when there is other significant evidence of guilt which reduces the likelihood that the otherwise improper testimony had a substantial impact upon the verdict of the jury."), quoting ***United States v. Rodriquez-Arevalo***, 734 F.2d 612, 615 (11th Cir. 1984).

We also note that Murchison was not a co-defendant. Therefore, ***Bruton v. United States***, 391 U.S. 123 (1968), upon which appellant relies, is inapposite. ***Bruton*** involved the admission of a co-defendant's confession that also implicated the non-testifying defendant.

In his second issue on appeal, appellant claims that the trial court erred when it did not conduct an ***in camera*** examination of Murchison prior to his taking the stand and subsequent refusal to testify. The Commonwealth called Murchison to testify against appellant and his two co-defendants, Wright and Daniels. (Notes of testimony, 11/18/11 at 2.) Throughout direct examination and even more so through cross-examination, Murchison indicated that he refused to testify, invoking his Fifth Amendment privileges against self-incrimination. During cross-examination, the trial court excused Murchison from the witness stand, and provided a curative instruction to the jury. (***See*** notes of testimony, 11/21/11 at 24-26.)

Our supreme court has stated that "it is prejudicial error for a prosecutor to summon a witness to the stand in a criminal trial **with**

**foreknowledge** that the witness intends to invoke a privilege against self-incrimination." **Commonwealth v. DuVal**, 307 A.2d 229, 231-232 (Pa. 1973) (emphasis added). When a court is determining whether or not prosecutorial misconduct took place, the credibility determinations of the fact-finder are binding on an appellate court. **Commonwealth v. White**, 734 A.2d 374, 381 (Pa. 1999) (stating that in the past, our supreme court has held that there is no justification for appellate courts to review a fact finder's first-hand credibility determination relying "solely upon a cold record").

In the instant case, the trial court held a hearing to determine if the Commonwealth called Murchison to the stand with the prior knowledge that he was intending to invoke his Fifth Amendment privileges. At the conclusion of the hearing, the trial court made the following determination as to the Commonwealth's credibility:

> As to credibility, I believe Mr. Vega[2] when he says he did not put the witness up knowing that he was going to clam up on cross-examination and be the reluctant witness which he was on the witness stand.
>
> Based on the argument I heard, based on my observation of Mr. Murchison and the agreement between the Commonwealth and the witness, Mr. Murchison, the motion for mistrial is denied.

Notes of testimony, 11/23/11 at 164.

---

[2] Philadelphia County Assistant District Attorney Carlos Vega, Esq.

In his third issue for our review, appellant claims that the trial court erred by failing to sustain defense counsel's objections to the Commonwealth's leading questions during Murchison's direct examination. As we just discussed, Murchison's testimony was stricken in its entirety and the jury is presumed to follow the instructions of the court. Moreover, as we also just noted, the remaining evidence against appellant was overwhelming. We see no prejudice to appellant on this issue, and we find no error by the trial court.

For his fourth issue, appellant claims that the trial court erred when it denied appellant's motion for a mistrial for prosecutorial misconduct during the Commonwealth's summation. When reviewing a claim of prosecutorial misconduct, we use the following standard of review:

> Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion. In considering this claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one. Not every inappropriate remark by a prosecutor constitutes reversible error. A prosecutor's statements to a jury do not occur in a vacuum, and we must view them in context. Even if the prosecutor's arguments are improper, they generally will not form the basis for a new trial unless the comments unavoidably prejudiced the jury and prevented a true verdict.

*Commonwealth v. Bedford*, 50 A.3d 707, 715-716 (Pa.Super. 2012) (*en banc*); *appeal denied*, 57 A.3d 65 (Pa. 2012) (citations omitted). *See also Commonwealth v. Robinson*, 877 A.2d 433, 441 (Pa. 2005)

(prosecutorial misconduct does not occur unless the jurors form a fixed bias and hostility toward the defendant based on the prosecutor's comments). When specifically considering a prosecutor's comments to a jury during closing arguments, this court has stated, "It is well settled that a prosecutor has considerable latitude during closing arguments and his arguments are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence." *Commonwealth v. Caldwell*, 117 A.3d 763, 774 (Pa.Super. 2015) (*en banc*) (citations omitted). This court further stated that any taint from a prosecutor's improper statements may be cured by a curative instruction to the jury, and that courts are compelled to consider "all surrounding circumstances before finding that curative instructions [are] insufficient and the extreme remedy of a mistrial is required." *Id.* (citations omitted). A jury is presumed to have followed any instructions provided by the trial court. *Commonwealth v. Elliott*, 80 A.3d 415, 445 (Pa. 2013), citing *Commonwealth v. DeJesus*, 860 A.2d 102, 111 (Pa. 2004).

Appellant alleges that the Commonwealth engaged in misconduct on three occasions during closing arguments: referencing the stabbing of Langdon Scott, mischaracterization of Officer DeMayo's testimony, and statements about the handling of the cell phone allegedly belonging to Vernon Williams. (*See* appellant's brief at 48-52.) Specifically, on all three occasions defense counsel objected, indicating that the Commonwealth had

alluded to facts that were either "not testified to," or facts for which "there was no evidence." (Notes of testimony, 11/29/11 at 158-159, 169, 176-177.) The trial court overruled all three objections, stating that the jury's recollection controls. (*Id.*) For the purposes of our review, we shall address the allegations separately.

First, defense counsel objected during the Commonwealth's closing argument when the prosecutor made references to the stabbing of Langdon Scott. (*Id.* at 174.) Specifically, the Commonwealth alluded to "courage" shown by Scott through his testimony after allegedly being stabbed. (*Id.* at 174.) After considering defense counsel's objection, the trial court offered a curative instruction to the jury clarifying that "[t]here was no evidence presented that any of these three Defendants had any involvement at all in that stabbing and [the jury] must not draw an inference from the argument that they did." (*Id.* at 181.)

We find that this statement did not have any prejudicial effect on the jury that would warrant granting defense counsel's motion for a mistrial. During closing arguments, the Commonwealth only made reference to the allegation that Scott was stabbed,[3] but at no point did the prosecutor, either directly or indirectly, intimate that appellant was responsible. Moreover, the trial court provided the jury with a curative instruction, telling them to

---

[3] The trial court refused to allow testimony regarding Scott being the victim of a stabbing due to lack of evidence. (Notes of testimony, 11/16/11 at 105.)

disregard any references to Scott's stabbing. Since the jury is presumed to have followed the trial court's instruction, appellant has not demonstrated how he was prejudiced by the Commonwealth's reference to Scott's stabbing during closing arguments.

Second, appellant objected to the Commonwealth's references to Officer DeMayo's testimony. Specifically, appellant alleges that the Commonwealth blatantly misstated Officer DeMayo's testimony in regards to where keys to Thal's apartment were located. (Appellant's brief at 50.) At the time Officer DeMayo's testimony was referenced during closing arguments, defense counsel's objection was overruled by the trial court. (Notes of testimony, 11/29/11 at 159.) Third, defense counsel raised an objection during closing arguments to the Commonwealth's statements regarding the police's processing of the cell phone that was brought to police by Woodward's wife, which was overruled by the trial court. (Appellant's brief at 51; notes of testimony, 11/29/11 at 169.) The trial court reiterated its rulings on defense counsel's objections the following day prior to final jury instructions, stating that while defense counsel had made an objection for the record, the Commonwealth's statements were a matter of argument and not evidence, therefore the jury's recollection is "what counts." (Notes of testimony, 11/30/11 at 12.)

We therefore find that appellant does not demonstrate that the jury formed a fixed bias or prejudice toward him as contemplated by our supreme court in **Robinson**.

In his fifth issue for our review, appellant claims that the trial court erred by allowing Detective John Cummings to testify as to hearsay statements from Antoine Thomas.[4] Specifically, Detective Cummings testified regarding an interview that the police conducted with Thomas on July 17, 2009.

Hearsay is defined as an out-of-court statement made for the truth of the matter asserted. Pa.R.E. 801(c). Our supreme court has stated that certain statements, which would otherwise be subject to the rule against hearsay,[5] are admissible if the statements are not offered for the truth of the matter asserted, but rather are admitted to explain a course of police conduct. **Commonwealth v. Jones**, 658 A.2d 746, 751 (Pa. 1995) (citations omitted), **see also Commonwealth v. Chmiel**, 889 A.2d 501, 532-533 (Pa. 2005) (requiring the trial court to balance the Commonwealth's need for the statements and any prejudice arising from the statements while exercising discretion regarding their admission), **cert denied**, 549 U.S. 848 (2006). Our supreme court cautions, however,

---

[4] Antoine Thomas was the person who appeared on the surveillance tape at the Piazza Navona that defense counsel referenced during opening statements. (**See** Notes of testimony, 11/15/11 at 198.)

[5] **See** Pa.R.E. 802.

that not every out-of-court statement describing police conduct is admissible; statements that could be considered by a jury to be substantive evidence of a defendant's guilt could be inadmissible. *Commonwealth v. Palsa*, 555 A.2d 808, 810 (Pa. 1989); *see also Commonwealth v. Mosley*, 114 A.3d 1072, 1078-1079 (Pa.Super. 2015).

Appellant claims that as a result of the trial court allowing Detective Cummings to testify regarding statements made by Thomas, appellant's cross-examination rights were "destroyed," and that the statements were highly prejudicial. (Appellant's brief at 56.) These claims are without merit because defense counsel, in his opening statement at trial, called police investigative tactics into question, claiming that the police had failed to fully investigate everyone who appeared on surveillance tapes at the time of the incident. (Notes of testimony, 11/14/11 at 66-67.)

This assertion opened the door for Detective Cummings's testimony regarding the police's investigation. Specifically, Detective Cummings testified that Thomas, the man in the blue hoodie to whom defense counsel had alluded in opening statements, had been interviewed by the police, and the police determined that he was not involved in the deaths of Thal and Gilmore. (Notes of testimony, 11/15/11 at 198, 202.) Therefore, we find that Detective Cummings's testimony regarding Thomas' statements were not introduced for the truth of the matter asserted; rather, they were

introduced to establish police conduct, which is not subject to the rule against hearsay.

Finally, in his sixth issue, appellant argues that he could not be convicted and sentenced on three separate counts of criminal conspiracy where the Commonwealth only proved a single, overarching conspiratorial agreement. The Commonwealth concedes the point and agrees that two of the convictions for criminal conspiracy must be vacated. (Commonwealth's brief at 34-35.)

"A claim that the trial court imposed an illegal sentence by failing to merge sentences is a question of law. Accordingly, our standard of review is plenary." *Commonwealth v. Snyder*, 870 A.2d 336, 349 (Pa.Super. 2005), quoting *Duffy*, 832 A.2d 1132, 1137 (Pa.Super. 2003).

> Our Courts have long held that where a defendant commits multiple distinct criminal acts, concepts of merger do not apply. *Commonwealth v. Anderson*, 650 A.2d 20 (Pa. 1994); [*Commonwealth v. Johnson*, 874 A.2d 66, 70 (Pa.Super 2005), *appeal denied*, 899 A.2d 1122 (Pa. 2006)]; *see also* 42 Pa.C.S.A. § 9765 ("no crimes shall merge for sentencing purposes unless the crimes **arise from a single criminal act** and all of the statutory elements of one offense are included in the statutory elements of the other offense.")

*Commonwealth v. Robinson*, 931 A.2d 15, 24 (Pa.Super. 2007) (*en banc*) (emphasis in original). *See also Commonwealth v. Gatling*, 807 A.2d 890, 899 (Pa. 2002) (plurality) ("The preliminary consideration is whether the facts on which both offenses are charged constitute one solitary

criminal act. If the offenses stem from two different criminal acts, merger analysis is not required. If, however, the event constitutes a single criminal act, a court must then determine whether or not the two convictions should merge.").

> In determining whether a single conspiracy or multiple conspiracies have been established, we must consider several relevant factors: The factors most commonly considered in a totality of the circumstances analysis of the single vs. multiple conspiracies issue . . . are: the number of overt acts in common; the overlap of personnel; the time period during which the alleged acts took place; the similarity in methods of operation; the locations in which the alleged acts took place; the extent to which the purported conspiracies share a common objective; and, the degree to which interdependence is needed for the overall operation to succeed.

*Commonwealth v. Barnes*, 871 A.2d 812, 820 (Pa.Super. 2005), *affirmed*, 924 A.2d 1202 (Pa. 2007) (citations omitted).

Appellant was convicted of three counts of conspiracy: one for his attempted robbery at 3:30 a.m. on May 27 in which appellant and Keith broke in to the wrong apartment, and two separate conspiracies for robbing Thal and Gilmore of drugs and money during which both victims were shot and killed. The Commonwealth concedes that all three acts were part of one overarching conspiracy, therefore, based on this concession, we vacate two of the conspiracy convictions.[6] Since appellant received concurrent

---

[6] The Commonwealth made this same concession as to co-defendants Daniels and Wright. In resolving those appeals, we also vacated one of the conspiracy convictions related to the Thal and Gilmore killings.

sentences for the conspiracy convictions, the trial court's overall sentencing scheme remains intact and we will not remand for re-sentencing. Appellant is serving two consecutive life sentences for murder.

Appellant's convictions of criminal conspiracy at Nos. CR-0012200-2009 and CR-0012195-2009 are vacated. Judgment of sentence affirmed on all other counts. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/24/2015