# COMMONWEALTH of Pennsylvania, Appellee

## v.

## Robert RAGLIN, Appellant

## No. 1152 WDA 2016

Superior Court of Pennsylvania.

Argued October 24, 2017

Filed January 23, 2018

Anthony J. Christmas, Pittsburgh, for appellant.

Rebecca G. McBride, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

BEFORE: BENDER, P.J.E., SHOGAN, J., and MUSMANNO, J.

OPINION BY BENDER, P.J.E.:

Appellant, Robert Raglin, appeals from the judgment of sentence of 4–8 years' incarceration, and a consecutive year of probation, imposed following his convictions for firearms offenses, driving with a suspended license, and possession of marijuana. Herein, Appellant challenges the trial court's denying suppression of the seized contraband, arguing the police temporarily detained him without reasonable suspicion that he was engaged in criminal conduct. After careful review, we affirm.

The trial court summarized the facts adduced at trial as follows:

[T]estimony was taken at the Suppression hearing on February 25, 2016. Officer Robert Smolinski testified that he was on desk duty on February 17, 2015 at approximately 7:32 p.m., which included dispatching any "shot spotter" notifications.

He went on to explain that the [shot spotter] system is used to "detect gunshots in the Zone 5 area[;] an alert tone comes to the desktop monitor giving an

address and a red dot appears, which is the most accurate location of the shot."

He also noted that "[w]henever a certain amount of sensors are triggered by the gunshot or firework, it is pretty good at distinguishing which one, it will alert the Zone 5 desktop, it will give an address of where the gunshots come from ... [and] it will put a red dot where the sensors provided it up and the company has it accurate up to within 25 yards.["]

On the date in question, the officer received notice that a gunshot was spotted on Annan Way, and officers were dispatched to the location.

Officer Smolinski testified that the Homewood neighborhood where the shot was detected [was] ... a high crime area. Sergeant Arthur Baker testified that he was on patrol and that he responded to Officer Smolinski's dispatch, at 7315 Finance Street, w[ith] Annan Way being an alle[y] between Susquahanna Street and F[inance] Street. His response to the location took less than a minute. Sergeant Baker testified that he observed two black males in the street very close to the location of the shot fired on the shot spotter, who separated when they saw police, with one getting in a silver Lincoln and the other getting [in] a maroon sedan. The officer then followed both vehicles, eventually losing sight of the maroon car. The Lincoln was observed making several turns, eventually pulling over on Thomas Boulevard. [Appellant] opened his door and attempted to get out of the car. [Sergeant Baker ordered Appellant] to place his hands on the trunk where he conducted a pat-down search, due to the nature of the call where a shot was allegedly fired. Another officer, Sergeant Joyce walked up to [Appellant]'s vehicle, noticed a handgun on the console in plain view and notified Sergeant Baker. [Appellant] told the officers that "he had a warrant and a gun he was trying to get away," wherein [he] was placed in handcuffs. [Appellant] did not have a concealed permit.

The [trial c]ourt denied the suppression motion based on this testimony.

Trial Court Opinion ("TCO"), 6/13/17, at 3–4.

Following Appellant's arrest, the Commonwealth charged him with receiving stolen property, 18 Pa.C.S. § 3925; possession of contraband, 18 Pa.C.S. § 5123; person not to possess a firearm, 18 Pa.C.S. § 6105; carrying a firearm without a license, 18 Pa.C.S. § 6106; possession with intent to deliver a controlled substance, 35 Pa.C.S. § 780–113(a)(30); unauthorized use of a motor vehicle, 18 Pa.C.S. § 3928; tampering with physical evidence, 18 Pa. C.S. § 4910; possession of a controlled substance, 35 Pa.C.S. § 780–113(a)(16); possession of marijuana, 35 Pa.C.S. § 780–113(a)(31); driving without a license, 75 Pa.C.S. § 1501; and driving with a suspended license, 75 Pa.C.S. § 1543.

On February 16, 2016, Appellant filed a timely suppression motion. The trial court conducted a suppression hearing on February 25, 2016. After the hearing, the trial court permitted the parties to submit briefs in support of their respective suppression arguments. On May 25, 2016, the trial court issued an order denying Appellant's motion to suppress.

On July 20, 2016, Appellant proceeded to a non-jury trial, after the Commonwealth withdrew several counts. The trial court ultimately found Appellant guilty of person not to possess a firearm, carrying a firearm without a license, possession of a controlled substance, possession of marijuana, and driving with a suspended license. The trial court immediately sentenced Appellant to 4–8 years' incarceration for person

not to possess a firearm, and a consecutive term of 1 year of probation for possession of a controlled substance. The court sentenced him to no further penalty for the remaining counts. Appellant filed a timely notice of appeal, and then a timely, court-ordered Pa.R.A.P. 1925(b) statement. The trial court issued its Rule 1925(a) opinion on June 13, 2017.

Appellant now presents the following, multi-part question for our review:

1. Whether the [trial court] erred and/or abused its discretion in denying [Appellant]'s motion to suppress where:

   a. Officers failed to articulate a reasonable suspicion that [A]ppellant was lawfully detained after officers received a "shot spotter"/anonymous tip,

   b. Officers failed to articulate reasonable suspicion that [A]ppellant committed a violation of the motor vehicle code to justify the traffic stop and detention of [A]ppellant and his vehicle,

   c. Officers failed to articulate a legitimate concern that [A]ppellant posed a risk to the safety of the community and to justify the "investigative detention"/seizure of [his] person,

   d. Officers illegally seized [A]ppellant, based upon a hunch/suspicion, and failed to establish reasonable suspicion to detain [him].

Appellant's Brief at 4.

The essence of Appellant's multi-part claim is that the police lacked reasonable suspicion to conduct an investigative detention in this case.[1]

Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. McAdoo*, 46 A.3d 781, 783–84 (Pa. Super. 2012) (quoting *Commonwealth v. Hoppert*, 39 A.3d 358, 361–62 (Pa. Super. 2012)).

Fourth Amendment jurisprudence has led to the development of three categories of interactions between citizens and the police. The first of these is a "mere

---

1. Appellant does not dispute that, subsequent to the stop under consideration, the discovery of the gun in plain view in his vehicle, along with his contemporaneous statement that there was a warrant out for his arrest, and that he was trying to "get away" with the gun, established probable cause to arrest him. Accordingly, our focus is exclusively on the circumstances that preceded the police activating their lights, which occurred after Appellant stopped his vehicle, and simultaneous to when he got out of the vehicle and began approaching the police cruiser, but before the gun was discovered in plain view, and before he made incriminating statements.

encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. *See Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. *See Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Finally, an arrest or "custodial detention" must be supported by probable cause. *See Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Commonwealth v. Rodriquez*, 532 Pa. 62, 614 A.2d 1378 (1992).

*Commonwealth v. Ellis*, 541 Pa. 285, 662 A.2d 1043, 1047–48 (1995) (footnote omitted).

A police officer may detain an individual in order to conduct an investigation if that officer reasonably suspects that the individual is engaging in criminal conduct. *Commonwealth v. Cook*, 558 Pa. 50, 735 A.2d 673, 676 (1999). "This standard, less stringent than probable cause, is commonly known as reasonable suspicion." *Id.* In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. *In re D.M.*, 566 Pa. 445, 781 A.2d 1161, 1163 (2001). In making this determination, we must give "due weight ... to the specific reasonable inferences [the police

officer] is entitled to draw from the facts in light of his experience." *Cook*, 735 A.2d at 676 (quoting *Terry...*, 392 U.S. [at] 27 [88 S.Ct. 1868]. Also, *the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct.* Rather, "[e]ven a combination of innocent facts, when taken together, may warrant further investigation by the police officer." *Cook*, 735 A.2d at 676.

*Commonwealth v. Rogers*, 578 Pa. 127, 849 A.2d 1185, 1189 (2004) (emphasis added).

Instantly, Appellant notes that our consideration of the "Shot Spotter" technology is one of first impression. He likens the technology to "almost the equivalent of an anonymous tip," but he contends that it is less reliable than an anonymous tip, because it "is incapable of providing a description of potential suspects that can be confirmed by police as the law requires." Appellant's Brief at 13. Thus, Appellant argues that the "Shot Spotter" technology should be treated like an uncorroborated anonymous tip, which, by itself, does not justify a *Terry* stop. *See Commonwealth v. Jackson*, 548 Pa. 484, 698 A.2d 571, 574 (1997) (recognizing that "a *Terry* stop may be made on the basis of an anonymous tip, [but only when] the tip is sufficiently corroborated by independent police work to give rise to a reasonable belief that the tip was correct").

■ Initially, we are skeptical of Appellant's analogy, because our suspicion of uncorroborated anonymous tips[2] is premised on human imperfections—the potential for both misperception and intentional wrongdoing by the tipster—coupled with

---

2. "When ... the underlying source of the police department's information is an anonymous telephone call, the courts have recognized that the tip should be treated with particular suspicion." *Jackson*, 698 A.2d at 573.

an inability to test the reliability of the tip. *See Jackson*, 698 A.2d at 574 ("[A] known informant places himself or herself at risk of prosecution for filing a false claim if the tip is untrue, whereas an unknown informant faces no such risk."). The risks of unreliability from anonymous tips appear more significant than those presented by the "Shot Spotter" technology. Even if the operator of the technology provides false information, or simply makes a mistake in interpreting its results, that person rarely, if ever, will be anonymous. Indeed, Officer Smolinski operated/monitored the "Shot Spotter" system used in this case, and the Commonwealth called him as a witness at Appellant's suppression hearing. However, we do not believe a definitive ruling on the degree of reliability of the "Shot Spotter" technology is prudent at this time, for the reasons that follow.

■ The *Terry* stop at issue here was based on more than just the data obtained from that system. The police responded to the location provided by the "Shot Spotter" in about one minute. N.T. Suppression Hearing, 2/25/16, at 14. When Sergeant Baker arrived at that specific location, he observed Appellant and another black male standing in the middle of the street, "very, very close to the area where the shot was fired." *Id.* at 15–16. When Appellant and the other man saw the police arriving on the scene, they separated and got into different vehicles.[3] *Id.* at 16. When Sergeant Baker began to follow Appellant, Appellant stopped his vehicle, and began

to exit the vehicle just as Sergeant Baker activated his lights. *Id.* at 18, 28. Appellant started walking toward Sergeant Baker's vehicle; in response, the officer ordered him to place his hands on the back of his vehicle for a pat-down. *Id.* All of this occurred in a high crime area, known for both drug trafficking and violent gun crimes. *Id.* at 11.

We conclude that the totality of these circumstances were sufficient to establish a reasonable suspicion that Appellant had been involved in the shooting detected by the "Shot Spotter." These circumstances are: 1) the data received from the "Shot Spotter" itself, which established that a shot had been fired, indicating the likely occurrence of a crime; 2) Appellant's close proximity, spatially and temporally, to the location identified by the technology; 3) Appellant's evasive behavior when the police arrived; 4) Appellant's strange act of jumping out of his vehicle just as Sergeant Baker activated his lights; and 5) the occurrence of these events in a high crime area. None of these circumstances, by themselves, conclusively demonstrate that Appellant was engaged in criminal activity. However, in combination, they warranted further investigation by Sergeant Baker and his partner. *See Rogers*, *supra.* As such, we conclude that the trial court's order denying Appellant's motion to suppress was legally sound and supported by the factual record.

Thus, given the above analysis, we do not believe the "Shot Spotter" data, com-

---

3. Sergeant Baker indicated during cross-examination that Appellant and his companion appeared to be reacting to the arrival of police, rather than spontaneously separating just as police arrived:

Q. So you would say that even though you saw two separate cars, there was nothing they were doing suspicious, that if you doesn't [sic] follow them onto Susquehanna—

A. The way they looked at me before they got into the cars, very quick, yes, immediately separated, immediately got into the cars and started driving away with the shot spotter being right where they were. They were within the immediate area of the shot spotter in any case[;] I find that to be suspicious.

*Id.* at 24.

bined with Appellant's presence at the scene, were the sole reasons for the *Terry* stop conducted by Sergeant Baker. Accordingly, we do not find it prudent at this time to micro-analyze the weight that should be afforded to the "Shot Spotter" system and similar technologies in reasonable suspicion and/or probable cause assessments.[4]

Judgment of sentence *affirmed.*

4. In the future, unique circumstances may call into question the value of "Shot Spotter" data for this purpose, and its probative weight may change from case to case. A suspect's temporal and spatial relationship to the time and location identified by a "Shot Spotter" appears crucial to the significance of such information for identification purposes. The "Shot Spotter" does provide strong evidence that a crime has likely occurred, independent of the part it might play in identifying suspects; however, even that conclusion must come with a caveat that it is circumstance-dependent. For instance, identifying the discharge of a firearm at a shooting range, during business hours, would not be strong evidence of the commission of a crime. Accordingly, we believe the most prudent course of action at this time is to address this new technology on a case-by-case basis, rather than try to anticipate every possible combination of circumstances attendant to its future use.