J-A11017-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAMAR FOSTER | : | |
| | : | |
| Appellant | : | No. 619 WDA 2022 |

Appeal from the Judgment of Sentence Entered January 5, 2022
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0013992-2019

BEFORE:   BENDER, P.J.E., STABILE, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED: JULY 17, 2023**

Appellant, Jamar Foster, appeals from the judgment of sentence of 60 days' incarceration, a concurrent term of 6 months' probation, and $1,500 in fines, imposed after he was convicted of two counts of driving under the influence of alcohol (DUI), 75 Pa.C.S. §§ 3801(a)(1) (general impairment) and 3801(c) (highest rate of alcohol), and driving while operating privilege is suspended or revoked, 75 Pa.C.S. § 1453(b)(1.1)(i).  After careful review, we affirm.

The trial court summarized the facts underlying Appellant's convictions, as follows:

> At approximately 2:00 a.m. on September 17, 2019, Pittsburgh Police Officer Nathan Powers was on duty when he received a ShotSpotter[1] Notification of shots fired near 1439 Hoffman Street

---

[*] Retired Senior Judge assigned to the Superior Court.

in the City of Pittsburgh.[1]  While Officer Powers was en route to the area, a second ShotSpotter Notification was received that indicated four (4) additional rounds of gunfire had been discharged in the area.  As Officer Powers approached the area, he observed a vehicle parked, with the headlights on, … in an area with no other parked cars.  Officer Powers observed [Appellant] in the driver's seat of the vehicle, and a female in the passenger's seat.[2]  Officer Powers turned on his lights and began to initiate an investigatory stop of the vehicle.  [Appellant] then exited the driver's side of the vehicle, with his back to Officer Powers, and proceeded to walk towards a private residence.[3] Multiple units arrived on the scene as backup.  Officer Powers handcuffed [Appellant] for failing to comply with his orders.[4]  At that time, Officer Powers noticed a strong smell of alcohol, and that his eyes were watery and glassy.  Officer Powers then **Mirandized**[5] [Appellant] and took him into custody.  While [Appellant] was in the back of the police car, it was clear to Officer Powers that [Appellant] was highly intoxicated.  Officer Powers checked [Appellant's] driver's license, and it was determined that [Appellant's] license was DUI suspended.

> [1] ShotSpotter is a sensory system that uses multiple sensors to pick up a suspected gunshot to triangulate the gunshot

---

[1] Officer Powers testified that that location was known as a high-crime area. N.T. Suppression Hearing, 10/1/20, at 8.

[2] The woman was later identified as Appellant's girlfriend, Tiffany Towns. **See** N.T. Trial, 7/15/21, at 55.

[3] Officer Powers explained that, as Appellant walked away, he got out of his police vehicle and "ordered [Appellant] to return to the street so we could conduct an investigation."  N.T. Suppression Hearing at 7.

[4] Specifically, the officer testified that "[w]e ordered [Appellant] multiple times to return to the street.  … [Appellant] refused to comply with the officers and continued to walk away, at which point we feared that he was armed….  We drew our guns and ordered him at gunpoint, at which point he finally got down on the ground, and we had to forcefully handcuff him to get him under compliance."  N.T. Suppression Hearing at 8.

[5] **Miranda v. Arizona**, 384 U.S. 436 (1966).

location from a minimum of three (3) sensors and send a dispatch to the appropriate Pittsburgh Police zone station.

While Officer Powers investigated the firearm issue, he entered the vehicle. He observed that there was condensation on the interior of the windshield of the vehicle, consistent with the air conditioning having been on in the car, and that the engine was hot to touch. Based on Officer Powers['] observations, training, and experience as a police officer, he concluded that the vehicle had recently been driven. Furthermore, Officer Powers determined that [Appellant] had been driving the vehicle, based on his observation of [Appellant's] leaving the driver's seat when he arrived on the scene, that the air conditioning was on and running, and that the vehicle's headlights were on when he arrived. Officer Powers administered the [horizontal gaze nystagmus] test, which showed signs that [Appellant] was impaired. After that, [Appellant] was transferred … for an [I]ntoxilyzer [breath] test…, which showed that [Appellant's blood alcohol content] was .200, approximately one hour and twenty-two minutes after [Appellant] was taken into custody.

Trial Court Opinion (TCO), 7/19/22, at 1-3 (unnumbered).

Appellant was charged with the above-stated offenses and, on April 9, 2020, he filed a motion to suppress. Therein, Appellant stated that "[a] seizure occurred when Officer Powers activated the lights of his police vehicle and ordered [Appellant] to return to the street." Motion to Suppress, 4/9/20, at 3 ¶ 6. Appellant argued that Officer Powers did not have reasonable suspicion at that point to support the investigative detention of Appellant and, thus, it was illegal. *Id.* at 3 ¶ 7. On October 1, 2020, a hearing was conducted, at which Officer Powers was the sole witness. On October 5, 2020, the court entered an order denying Appellant's motion to suppress.[6] He

_____

[6] That order is dated October 1, 2020, but it was not filed until October 5, 2020.

- 3 -

proceeded to a non-jury trial on July 15, 2021. At the conclusion thereof, the court convicted him of the above-stated offenses. On January 5, 2021, the court sentenced Appellant as set forth, *supra*.

Appellant filed a timely post-sentence motion. On May 4, 2022, the trial court entered an order denying the post-sentence motion, and Appellant filed his notice of appeal on May 19, 2022.[7] Appellant thereafter complied with the

_____

[7] The court's order denying Appellant's post-sentence motion was entered 129 days after that motion was filed. Pursuant to Pennsylvania Rule of Criminal Procedure 720(B)(3)(a), a trial court "shall decide the post-sentence motion … within 120 days of the filing of the motion." Pa.R.Crim.P. 720(B)(3)(a). If the trial court fails to rule on the motion within 120 days, it will be deemed denied by operation of law. *Id.* "When a post-sentence motion is denied by operation of law, the clerk of courts shall forthwith enter an order on behalf of the court … that the post[-] sentence motion is deemed denied." *Id.* at 720(B)(3)(c). When neither the trial court nor the clerk of courts enters an order denying an appellant's post-sentence motion within the 120-day period, this Court has held that a breakdown in the court's operation has occurred. *Commonwealth v. Perry*, 820 A.2d 734, 735 (Pa. Super. 2003) (holding "where the clerk of courts does not enter an order indicating that the post-sentence motion is denied by operation of law … a breakdown in the court system has occurred…"); *Commonwealth v. Braykovich*, 664 A.2d 133, 137-38 (Pa. Super. 1995) (finding a breakdown where neither the trial court nor the clerk of courts issued an order denying the defendant's post sentence motion within 120 days.). Further, where a breakdown occurs, this Court has found that an appeal filed within 30 days of an order filed outside the 120-day window is timely. *See Braykovich*, 664 A.2d at 135-38 (finding the appellant's appeal timely where although the trial court denied the appellant's post-sentence motion months after the 120 days had passed, the appeal was still filed within 30 days of said denial).

Here, we conclude that a breakdown in the operations of the court occurred, as the trial court did not rule on Appellant's post-sentence motion until nine days after the period set forth in Pa.R.Crim.P. 720(B)(3)(a) had passed. Nevertheless, because Appellant filed his instant notice of appeal within thirty days of the trial court's order denying his post-sentence motion, we conclude that his appeal was timely filed.

court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, and the court filed its responsive Rule 1925(a) opinion on July 19, 2022.

Herein, Appellant raises three issues for our review:

I.    Whether the [t]rial [c]ourt erred in denying suppression where Officer Powers ordered [Appellant] at gunpoint to stop and return to the officer's position but, at the precise moment of seizure, the officer lacked reasonable suspicion, based on specific and articulable facts, to believe that [Appellant] was engaged in criminal activity?

II.   Whether the [t]rial [c]ourt erred and abused its discretion in admitting the testimony elicited by the Commonwealth from … Officer … Powers on matters which required specialized knowledge and therefore was inadmissible because he was not qualified as an expert?

III.  Whether the [t]rial [c]ourt erred in denying [d]efense motions for judgment of acquittal (and therefore challenges to the sufficiency of the evidence) where the Commonwealth failed to prove the material elements of all charges in this matter requiring [Appellant] be driving, operating, or in actual physical control of the motor vehicle?

Appellant's Brief at 12.

Appellant first challenges the trial court's denial of his motion to suppress, contending that Officer Powers lacked reasonable suspicion to conduct the investigative detention in this case.

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a

whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. McAdoo*, 46 A.3d 781, 783–84 (Pa. Super. 2012) (quoting *Commonwealth v. Hoppert*, 39 A.3d 358, 361–62 (Pa. Super. 2012)).

Fourth Amendment jurisprudence has led to the development of three categories of interactions between citizens and the police. The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. *See Florida v. Royer*, 460 U.S. 491 … (1983); *Florida v. Bostick*, 501 U.S. 429, … (1991). The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. *See Berkemer v. McCarty*, 468 U.S. 420 … (1984); *Terry v. Ohio*, 392 U.S. 1 … (1968). Finally, an arrest or "custodial detention" must be supported by probable cause. *See Dunaway v. New York*, 442 U.S. 200 … (1979); *Commonwealth v. Rodriquez*, … 614 A.2d 1378 ([Pa.] 1992).

*Commonwealth v. Ellis*, … 662 A.2d 1043, 1047–48 ([Pa.] 1995) (footnote omitted).

A police officer may detain an individual in order to conduct an investigation if that officer reasonably suspects that the individual is engaging in criminal conduct. *Commonwealth v. Cook*, … 735 A.2d 673, 676 ([Pa.] 1999). "This standard, less stringent than probable cause, is commonly known as reasonable suspicion." *Id.* In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. *In re D.M.*, … 781 A.2d 1161, 1163 ([Pa.] 2001). In making this

> determination, we must give "due weight ... to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience." ***Cook***, 735 A.2d at 676 (quoting ***Terry***..., 392 U.S. [at] 27…). Also, ***the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct***. Rather, "[e]ven a combination of innocent facts, when taken together, may warrant further investigation by the police officer." ***Cook***, 735 A.2d at 676.
>
> ***Commonwealth v. Rogers***, … 849 A.2d 1185, 1189 ([Pa.] 2004) (emphasis added).

***Commonwealth v. Raglin***, 178 A.3d 868, 871–72 (Pa. Super. 2018).

Instantly, the parties agree that Appellant was subjected to an investigative detention when Officer Powers exited his police cruiser and ordered Appellant to return to Hoffman Street.[8] Appellant contends that Officer Powers lacked reasonable suspicion to conduct that investigative detention, explaining:

---

[8] According to Appellant, the detention began "when Officer Powers exited his police cruiser, drew his service weapon, and then ordered [Appellant] to 'stop' and then to 'come back here.'" Appellant's Brief at 52. While "the Commonwealth agrees that [Appellant] had indeed been seized when the officer ordered him to return to Hoffman Street," it notes that "the officer did not draw his gun prior to ordering [Appellant] back to Hoffman Street[,]" and that "Officer Powers did not tell Foster to 'stop[,]'" but, instead, he told him to "come back to the street" to talk to him." Commonwealth's Brief at 15 (citing N.T. Suppression Hearing at 7 (Officer Powers' stating that he "ordered [Appellant] to return to the street so [he] could conduct an investigation"); ***id.*** at 8 (Officer Powers' testifying that he drew his gun after ordering Appellant "multiple times to return to the street" and Appellant "refused to comply"); ***id.*** at 15 (the officer's testifying that he "told [Appellant] to come back to the street" to talk to him)). The record supports the Commonwealth's corrections to Appellant's rendition of the events. We accept the parties' agreement that Appellant was seized when Officer Powers exited his police vehicle and ordered Appellant to return to the street to talk to the officer.

At the time the seizure of [Appellant] occurred, Officer Powers had access to the following specific and articulable facts: (1) there had been multiple ShotSpotter notifications in the general area where [Appellant] was eventually located, (2) those shots occurred rapidly in time and shortly before Officer Powers arrived at the scene, (3) that ShotSpotter is sometimes inaccurate (including being whole addresses off target), (4) that ShotSpotter is an audio only system providing no visual observations of any activity before police arrival, (5) that no crime of any kind was observed or reported at any time, (6) that the area where the shots occurred is residential with multiple houses nearby, (7) that the area is a high crime area, (8) that the area was mostly dark in the early hours of the morning, (9) that [Appellant] did not run or in any way flee from police, (10) that no observations of anything resembling a firearm were seen on [Appellant], (11) that [Appellant] was not carrying any items in which he could conceal a firearm, (12) that [Appellant] was entirely cooperative with police, (13) and that no commotion or obvious signs of distress or criminal activity were present at the scene from either [Appellant] or Ms. Towns, and no property damage of any kind, consistent with the discharge of a firearm, was observed.

Appellant's Brief at 55-56.

In sum, Appellant claims that,

[a]t the time this seizure took place, the only facts that Officer Powers could have possibly relied upon were the spatial and temporal proximity of [Appellant] to the ShotSpotter alert. Because there are no other factors that could be claimed to justify reasonable suspicion, the reliability and credibility of the ShotSpotter system must be analyzed.

*Id.* at 56. Appellant then goes on to contend that "[a] ShotSpotter alert is akin to an anonymous tip and must be considered with more caution than known witness tips or observations." *Id.* He stresses that ShotSpotter "is not free from creating a misperception for police responding to an alert[,]" as it is "an audio only system, [and] there is no video means of recording what would trigger an alert or describing potential suspects for police to then corroborate

through investigation." *Id.* at 57. Thus, Appellant posits that the ShotSpotter technology is even "less reliable than an anonymous tip in that the danger for misperception of provided data is just as high as with a human witness and, even worse, [it] cannot provide any description of potential suspects." *Id.* at 58. Consequently, Appellant insists that police responding to a ShotSpotter alert "must investigate further before they have reasonable suspicion to stop a citizen." *Id.* Because, here, Officer Powers did not see anyone "in distress and nothing that would indicate a shooting took place[,]" such as "bullet strikes in the ground on his approach, [or] … bullet holes in the vehicle[,]" and Appellant did not flee, "reach about his person[,]" or appear to be in possession of any items, Appellant contends that Officer Powers lacked reasonable suspicion to detain him. *Id.* at 59-60.

In response, the Commonwealth contends that this Court has already "addressed and deemed to be faulty" an argument that ShotSpotter is akin to an anonymous tip. Commonwealth's Brief at 17 (citing in ***Commonwealth v. Raglin***, 178 A.3d 868 (Pa. Super. 2018)). Specifically, in ***Raglin***, an officer received a report from ShotSpotter that a single gunshot was detected in a high crime area. *Id.* at 870. A different officer was dispatched to the scene and arrived there less than a minute after the detected shot. *Id.* The officer observed Raglin and another man in the street, very close to the location of the shot. *Id.* As the officer approached, the two men separated and drove away in different vehicles. *Id.* The officer followed Raglin's vehicle, which eventually parked. *Id.* As Raglin attempted to exit the car, the officer ordered

him to place his hands on the trunk and the officer then patted Raglin down. *Id.* When another officer approached Raglin's car, he observed a handgun in plain view inside the vehicle. *Id.* Raglin was subsequently convicted of various crimes, including possession of a firearm without a license.

On appeal, Raglin claimed that the police lacked reasonable suspicion to conduct an investigative detention, arguing that the ShotSpotter technology is "almost the equivalent of an anonymous tip, but … that it is less reliable than an anonymous tip, because it is incapable of providing a description of potential suspects that can be confirmed by police as the law requires." *Id.* at 872 (citation and internal quotation marks omitted). "Thus, [Raglin] argue[d] that the 'ShotSpotter' technology should be treated like an uncorroborated anonymous tip, which, by itself, does not justify a *Terry* stop." *Id.* (some spacing altered) (citing *Commonwealth v. Jackson*, 698 A.2d 571, 54 (Pa. 1997) (recognizing that "a *Terry* stop may be made on the basis of an anonymous tip, [but only when] the tip is sufficiently corroborated by independent police work to give rise to a reasonable belief that the tip was correct")).

In assessing Raglin's arguments, we initially noted that "[t]he risks of unreliability from anonymous tips appear ***more significant*** than those presented by the 'ShotSpotter' technology." *Id.* at 873 (some spacing altered; emphasis added). We reasoned that, "[e]ven if the operator of the technology provides false information, or simply makes a mistake in interpreting its results, that person rarely, if ever, will be anonymous." *Id.*

Ultimately, the *Raglin* panel declined to offer "a definitive ruling on the degree of reliability of the "ShotSpotter" technology[,]" as the *Terry* stop in that case "was based on more than just the data obtained from that system." *Id.* (some spacing altered). Specifically, the totality of the circumstances included:

> 1) the data received from the "ShotSpotter" itself, which established that a shot had been fired, indicating the likely occurrence of a crime; 2) [Raglin's] close proximity, spatially and temporally, to the location identified by the technology; 3) [Raglin's] evasive behavior when the police arrived[, including his separating from the other male present and entering different vehicles;] 4) [Raglin's] strange act of jumping out of his vehicle just as [the officer] activated his lights; and 5) the occurrence of these events in a high crime area.

*Id.* We held that, although "[n]one of these circumstances, by themselves, conclusively demonstrate[d] that [Raglin] was engaged in criminal activity[,] … in combination, they warranted further investigation by" the officers. *Id.*

The Commonwealth argues that the circumstances in the instant case demonstrate, even more definitively than in *Raglin*, that Officer Powers possessed reasonable suspicion to detain Appellant. It explains:

> [A]s set forth previously, ShotSpotter detected—in two separate reports—that a total of five shots had been fired, which, the Commonwealth believes, would allow for even less probability of error than in an instance such as *Raglin* where only a single shot was detected. A mere 10 to 15 seconds after the second ShotSpotter notification, [Appellant] and his companion were found in a vehicle at the location where the shots were said to have been fired. Importantly, the two of them were the only people on the street at that time. Furthermore, like the defendant in *Raglin*, [Appellant] was seemingly behaving evasively, exiting his vehicle and walking away from the officer as the police vehicle arrived at the scene.[11] And, lastly, by [Appellant's] own

- 11 -

admission, the location in question was a high crime area at 2 a.m. (***see*** Brief for Appellant, at p. 55). The Commonwealth would respectfully submit that, although no[t] one of these circumstances [alone] may have conclusively demonstrated that [Appellant] was engaged in criminal activity, the combination of them certainly permitted Officer Powers to reasonably suspect that [Appellant] was involved in criminal behavior such that further investigation was warranted. As a result, [the trial court] cannot be said to have erred in denying [Appellant's] motion to suppress. ***Raglin***, ***supra***.

> [11] At the same time, his companion appeared to be grabbing for things in the front-passenger seat. [***See*** N.T. Suppression Hearing at 8.]

Commonwealth's Brief at 20-21 (footnote omitted).[9]

We agree with the Commonwealth. The totality of the circumstances in this case were at least equivalent to, if not more significant, than those in

***Raglin*** in terms of demonstrating reasonable suspicion to validate the

_____

[9] The Commonwealth also notes that,

> as additional support for his contention that Officer Powers lacked reasonable suspicion of criminal activity, [Appellant] asserts that he "was entirely cooperative with police[,] … stop[ping] when he was ordered to[,]" and that, furthermore, the officer did not observe "any unnatural bulge" indicative of a weapon (***see*** Brief for Appellant, at pp. 56, 60). But, as established above, [Appellant] was certainly not cooperative with the police, as evidenced by the fact that Officer Powers had to order him numerous times to come back to the street and needed to pull out his gun in order to get [Appellant] to obey his command. Furthermore, the transcript makes clear that it is of no moment that Officer Powers did not see any indication of a firearm on [Appellant's] person, as the officer testified that he would not have been able to observe the bulge of a gun in the darkness from the distance that he and [Appellant] were apart (***see*** [N.T. Suppression Hearing at] 20). Thus, neither line of argument does [Appellant] any good.

Commonwealth's Brief at 21 n.12.

investigative detention. Thus, as in **Raglin**, we need not decide whether Appellant is correct that a ShotSpotter alert is similar in reliability to an anonymous tip. Instead, it is clear that the trial court did not err in determining that Officer Powers possessed reasonable suspicion to detain Appellant.

Next, Appellant contends that the trial court erred by admitting expert testimony by Officer Powers when he was not qualified to provide such testimony. Specifically, Appellant takes issue with Officer Powers' testimony concerning the "vehicle's air conditioning system, the condensation produced from it (or lack thereof), the condensation on the interior of the vehicle, and the resulting inference drawn from that evidence." Appellant's Brief at 65. According to Appellant, "[t]he way an air conditioning system works in a motor vehicle is not something that is known to the average layperson." **Id.** While acknowledging that "Pennsylvania courts have generally agreed that operation (*i.e.*[,] driving) of a vehicle is something that is done or seen so often that lay persons can testify about it[,]" Appellant contends that

> Officer Powers testified to more than the typical operation of a motor vehicle. He instead testified about the air conditioning system in the incident vehicle and that air conditioning systems produce condensation which leaks from motor vehicles when in use. He also testified that condensation on the inner windshield of the vehicle meant that the air conditioning had been on for a "very long time," and that no visible condensation under the motor vehicle meant that it had to have been recently moved. This testimony was introduced by the Commonwealth to bolster the assertion that the vehicle had recently been moved.

*Id.* at 66. Appellant insists that this testimony was prejudicial, as it was relied upon by the trial court in concluding that the vehicle had recently been moved and, therefore, Appellant had driven it while intoxicated and while his license was revoked.

We need not determine whether the court erroneously permitted Officer Powers to offer expert testimony, as we agree with the Commonwealth that any error in admitting that testimony was harmless.

> Harmless error exists if the Commonwealth proves that the error did not prejudice [the a]ppellant or that any prejudice was *de minimis,* that the erroneously admitted evidence was cumulative of other properly admitted evidence which was substantially similar or the same as the erroneous evidence, or that the properly admitted and uncontradicted evidence of guilt was so overwhelming that the prejudicial effect of any error was so insignificant that it could not have contributed to the verdict.

***Commonwealth v. Lam***, 684 A.2d 153, 162 (Pa. Super. 1996).

Instantly, the Commonwealth contends:

> [Appellant] took the stand in his own defense and testified that he had not driven the vehicle that Officer Powers had come upon on the night in question but, rather, his female companion, Tiffany Towns, had (**see** [N.T. Trial at] 55-56).[14] Given the acknowledgement by [Appellant] that the car had been driven just prior to Officer Powers' arrival, the admission of the officer's aforementioned testimony regarding the air conditioning could have had no impact on the resolution of [Appellant's] case, as the question of whether or not the vehicle had been recently driven was not in dispute. Because [Appellant] admitted during his testimony that the vehicle had indeed been driven to that spot that night—[Appellant's] only contention was that he had not been the one who had driven it—the testimony about which [Appellant] now complains is moot and clearly could not have prejudiced him.
>
> [14] In [Appellant's] version of events, the vehicle belonged to his mother and, after Ms. Towns had driven the car to his

mother's residence—the location at which Officer Powers came into contact with it—the plan was for his mother to drive both of them to Ms. Towns' house (**see** [N.T. Trial at] 55-56).

Moreover, even if [Appellant's] testimony were put aside, the introduction of the officer's testimony regarding the air conditioning would still have been harmless because Officer Powers also testified that the vehicle's "engine was hot to the touch" ([N.T. Trial at] 16; **see** [**also** N.T. Trial at] 24). This Court has stated that the feel of heat from the hood of a car itself indicates that the car had recently been driven. **See Commonwealth v. Wilson**, 660 A.2d 105, 107 (Pa. Super. 1995). Thus, because the evidence of the air conditioning being on and the absence of condensation underneath [Appellant's] vehicle suggested the very same thing as did the properly admitted evidence of the warmth of the vehicle's engine, any error in the admission of the former would have been harmless for this reason as well. **Lam**, **supra**.

Commonwealth's Brief at 25-27.

We are convinced by the Commonwealth's argument, and our independent review of the record, that Appellant was not prejudiced by the introduction of Officer Powers' at-issue testimony. Accordingly, even if that testimony was improper, no relief is due.

Finally, Appellant challenges the sufficiency of the evidence to sustain his convictions. Initially, we observe that,

"[w]hether the evidence was sufficient to sustain the charge presents a question of law." **Commonwealth v. Toritto**, 67 A.3d 29 (Pa. Super. 2013) (*en banc*). Our standard of review is *de novo*, and our scope of review is plenary. **Commonwealth v. Walls**, 144 A.3d 926 (Pa. Super. 2016). In conducting our inquiry, we examine[,]

whether the evidence at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict-winner, [is] sufficient to establish all elements of the offense beyond a reasonable

- 15 -

doubt. We may not weigh the evidence or substitute our judgment for that of the fact-finder. Additionally, the evidence at trial need not preclude every possibility of innocence, and the fact-finder is free to resolve any doubts regarding a defendant's guilt unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. When evaluating the credibility and weight of the evidence, the fact-finder is free to believe all, part or none of the evidence. For purposes of our review under these principles, we must review the entire record and consider all of the evidence introduced.

*Commonwealth v. Trinidad*, 96 A.3d 1031, 1038 (Pa. Super. 2014) (quotation omitted).

*Commonwealth v. Rojas-Rolon*, 256 A.3d 432, 436 (Pa. Super. 2021), *appeal denied*, 285 A.3d 879 (Pa. 2022).

Under both Appellant's convictions for DUI (general impairment and highest rate of alcohol), the Commonwealth was required to prove that Appellant drove, operated, or was in actual physical control of the movement of his vehicle. *See* 75 Pa.C.S. § 3802(a)(1), (c). Additionally, for Appellant's conviction of driving while operating privileges are suspended or revoked, the Commonwealth was also required to prove that he drove his vehicle. *See* 75 Pa.C.S. § 1543(b)(i). Thus, as Appellant observes, "[a]cross all of these charges is a single common element requiring driving, operation, or [actual physical control] of either the machinery of the motor vehicle or the management of the vehicle's movement, but not evidence that the vehicle was in motion." Appellant's Brief at 73 (citing *Commonwealth v. Brotherson*, 888 A.2d 901, 904 (Pa. Super. 2005) ("The term 'operate' requires evidence of actual physical control of either the machinery of the

motor vehicle or the management of the vehicle's movement, but not evidence that the vehicle was in motion.")).

Appellant contends that the Commonwealth failed to prove this 'common element' of the three offenses for which he was convicted. Focusing on the 'actual physical control' element, Appellant stresses that no one observed the vehicle in motion at any point, no one saw Appellant driving the vehicle, the vehicle's engine was not running, the keys were not in the ignition, and the vehicle was never in gear. He also points out that no one saw his hands on the steering wheel or gear shifter, or his feet on the brake or the gas pedals. He also was not alone in the vehicle, and Ms. Towns actually possessed the keys to the car. Appellant argues that "no witness could testify as to the length of time that the vehicle was in the place where it was discovered[,]" and, even if the vehicle had been recently moved, there was "no way to establish when it had been moved, or where it had been moved from." Appellant's Brief at 75-76. He points out that Officer Powers admitted "that it was entirely possible that Ms. Towns (or someone else) may have driven the vehicle to [Appellant's] residence." *Id.* at 76.

Moreover, Appellant claims that the location of the vehicle was not suspicious, as it was parked at his house. In ***Brotherson***, we acknowledged that "[i]n a majority of cases, the suspect location of the vehicle, which supports an inference that it was driven, is a key factor in a finding of actual control." ***Brotherson***, 888 A.2d at 905 (citations omitted). There, we concluded that the "highly inappropriate location" of Brotherson's car, which

was found "on the basketball court of a gated children's playground[,] created a strong inference that it was an already[-]intoxicated Brotherson who had driven the car to that spot." *Id.* *See also Commonwealth v. Dirosa*, 249 A.3d 586 (Pa. Super. 2021), *appeal denied*, 261 A.3d 1033 (Pa. 2021) (finding the evidence sufficient to support Dirosa's DUI conviction where officers discovered Dirosa asleep in the driver's seat of his vehicle, which was parked outside a Wawa gas station at approximately 2:30 a.m. in between the clearly marked lines of the handicap parking spaces in front of the store); *Commonwealth v. Toland*, 995 A.2d 1242, 1246 (Pa. Super. 2010) (finding sufficient evidence of actual physical control where officers found Toland parked outside a store and asleep in the driver's seat of his vehicle with the motor running and headlights illuminated). "Conversely, where the location of a car supported the inference that it was not driven, this Court rejected the inference of actual physical control." *Brotherson*, 888 A.2d at 905 (citing *Commonwealth v. Byers*, 650 A.2d 468, 469 (Pa. Super. 1994), *abrogated on other grounds by Commonwealth v. Wolen*, 685 A.2d 1384 (Pa. 1996)) (concluding that there was no actual physical control even though Byers was found asleep behind the wheel of his running car, because the car had not been moved from the parking lot of the bar where Byers became intoxicated)).

Appellant here contends that, unlike *Brotherson*, *Dirosa*, and *Toland*,

> the vehicle engine was not running, though the headlights were on. [Appellant] was not slumped over in the driver's seat asleep or unconscious. The incident vehicle was not located in some inappropriate location such as on a children's basketball court, parked outside the lines of parking spaces at different

- 18 -

establishments, or located at a place which might be called a "temporary destination." Here, the vehicle was seen in an alleyway in the immediate vicinity of [Appellant's] residence[,] which is a "final destination." It was parked parallel to both the alleyway itself and a chain link fence on the opposite side of the pavement. Further, [Appellant] was not alone at the scene or in the vehicle itself; he was instead in the company of his girlfriend who had the vehicle keys on her person. [Appellant] did not have any sort of control of the actual machinery of the vehicle itself in that his foot wasn't on the gas or brake, the vehicle was in park, the keys were not in the ignition, and [Appellant's] hands were not on the steering wheel. In short, [Appellant] had no ability to operate the vehicle absent the keys, and he was not operating any machinery in the vehicle to restrain its movement in any way. Similar to **Byers**, no one observed [Appellant] drive the motor vehicle at any time, no one observed the vehicle to have been moved, and there was not a shred of evidence that would indicate that [Appellant] had any intent to move or drive the vehicle in the immediate future.

Appellant's Brief at 81-82 (footnote and emphasis omitted). Appellant adds that, even if we "infer that the vehicle itself was moved that evening based on inferences that could be drawn from the testimony of Officer Powers, there is simply no way to know when the vehicle was moved, where it was moved from, who moved it, or how long the vehicle may have been in the location where it was discovered." *Id.* at 84-85. Thus, Appellant claims that he should "be acquitted of all charges" because "[t]he evidence is insufficient to support a finding that [he] was in [actual physical control] of the motor vehicle, and any inference that he moved [the] vehicle that evening is speculative." *Id.* at 85.

We disagree.

Our precedent indicates that a combination of the following factors is required in determining whether a person had 'actual physical control' of an automobile: the motor running, the location of the

vehicle, and additional evidence showing that the defendant had driven the vehicle. ***Commonwealth v. Woodruff***, … 668 A.2d 1158, 1161 ([Pa. Super.] 1995). A determination of actual physical control of a vehicle is based upon the totality of the circumstances. The Commonwealth can establish through wholly circumstantial evidence that a defendant was driving, operating or in actual physical control of a motor vehicle.

***Dirosa***, 249 A.3d at 589 (some citations and internal quotation marks omitted).

Here, the motor of Appellant's vehicle was not running, and it was not parked as suspiciously as in the cases discussed *supra*. However, Officer Powers testified that Appellant's vehicle was half on and half off the roadway, parked in a "very narrow alleyway" where the officer, in his five years of patrol experience, had "never seen anyone parked" before. N.T. Trial at 26, 27. Moreover, there was additional evidence showing that Appellant had driven the vehicle. Namely, Appellant was sitting in the driver's seat of the car while the headlights were on and the hood of the car was hot to the touch, indicating that the vehicle had been recently driven. Although the keys were found in Ms. Town's possession, Officer Powers testified that as he approached the car, he "observed [Ms. Town] grabbing items in the vehicle and putting them in her purse." *Id.* at 29. When asked whether Ms. Towns could have grabbed the car keys at that time, the officer stated it was "[v]ery possible." *Id.* Appellant also testified that the vehicle belonged to his mother and that he had borrowed the car from her. *Id.* at 55, 56. Additionally, Appellant's evasive act of getting out of the driver's seat and walking away from the car

as soon as he saw Officer Powers' approaching is indicative of his consciousness of guilt.

Finally, we agree with the Commonwealth that **Byers** is distinguishable. It explains:

> [T]here, the defendant, drunk and asleep, was found in the driver's seat of a vehicle, as opposed to leaving it, and, furthermore, the vehicle was parked in the parking lot of a lounge. [**Byers**,] 650 A.2d at 468-69. Thus, it was certainly possible that the defendant in that case had consumed alcohol inside of the establishment prior to entering his car without ever having driven it in an intoxicated state. The same does not hold true in the instant matter, as there was no similar evidence that [Appellant] had consumed alcohol near the location where the car was parked, nor any plausible explanation as to why [he] was exiting the driver's seat of the car—the engine of which had recently been running and the headlights of which [were] on—if he had not just driven the vehicle to that location.

Commonwealth's Brief at 33-34 (footnotes omitted).

In sum, when viewed in the light most favorable to the Commonwealth, and giving it the benefit of all reasonable inferences, we conclude that the evidence was sufficient to establish that Appellant had driven the at-issue vehicle while intoxicated. Accordingly, no relief is due.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/17/2023

- 21 -